**TOWN OF CHARLESTOWN, RHODE ISLAND, et al.**

v.

**The UNITED STATES of America, et al.**

**Civ. A. No. 87–0580 P.**

United States District Court, D. Rhode Island.

July 13, 1988.

Deming E. Sherman, Mark Dolan, Providence, R.I., for plaintiffs.

Everett C. Sammartino, Asst. U.S. Atty., Providence, R.I., Howard Sweet, Jr., Westerly, R.I., Gordon Cleary, David Dugan, Sp. Asst. Atty. Gen., State of R.I., Providence, R.I., for U.S.

## OPINION AND ORDER

PETTINE, Senior District Judge.

The Town of Charlestown together with Gary W. Anderson, Sr., president of the Charlestown Town Council, and Phyllis T. Brown, vice-president of the Charlestown Town Council, have brought this action for declaratory and injunctive relief under the contract clause, art. 1, section 10, of the United States Constitution and art. 1, section 12 of the Rhode Island Constitution. The gravamen of plaintiffs' complaint is that the Act of June 28, 1985, Pub.L. No. 1985, ch. 386, 1985 R.I.Pub. Laws 912 (codified as R.I.Gen.Laws sections 37–18–2, 37–18–3, 37–18–7, 37–18–12, 37–18–13, 37–18–14, and 37–18–15) (amending the Narragansett Indian Land Management Corporation Act, Pub.L. No. 1979, ch. 116, 1979 R.I.Pub. Laws 402), unconstitutionally interferes with a contractual agreement into which the Town of Charlestown entered with the State of Rhode Island, the United States of America and the Narragansett Tribe of Indians. The latter defendant has responded that plaintiffs lack standing to assert this claim.

## BACKGROUND

The Narragansett Tribe of Indians filed two lawsuits in the United States District Court for the District of Rhode Island on January 8, 1978. As defendants in these suits, the Narragansett Indians named the Director of the Rhode Island Department of Environmental Management and myriad private landowners. Through these suits, the Tribe sought possession of approximately 3,200 acres of public and private

land in Charlestown, Rhode Island. According to the Tribe, it owned and occupied these lands as part of its aboriginal territory and reservation. Moreover, the Tribe contended, these lands were improperly alienated from it in 1880 by the State of Rhode Island in violation of the Trade and Intercourse Act of 1790, the final 1834 version of which was codified as 25 U.S.C. section 177. The relevant provision of this Act provides that

No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

Because the contested alienation of its tribal lands was never approved by the federal government as required by this Act and the Tribe's aboriginal title to these lands was never extinguished, the Tribe claimed that its title to these lands was superior to any title held by the state or private landowners that can be traced to the allegedly illegal transfer of 1880.

After consolidation into a single action the Tribe successfully moved to strike certain defenses asserted by the State and private landowners. This success led to lengthy negotiations between the parties to the lawsuit, including then Governor Garrahy and the Charlestown Town Council. As the United States Congress found and declared, "the pendency of these lawsuits has resulted in severe economic hardships for the residents of the town of Charlestown by clouding the titles to much of the land in the town, including lands not involved in the lawsuits." 25 U.S.C. section 1701(b). At this time, the Congress further declared that it "shares with the State of Rhode Island and the parties to the lawsuits a desire to remove all clouds on titles resulting from such Indian land claims within the State of Rhode Island." 25 U.S.C. section 1701(c). This desire was realized on February 28, 1978, when the negotiations resulted in a settlement agreement which resolved the Tribe's claims out of court. The settlement agreement "set[ ] forth a number of provisions which would form the basis for a legislative resolution of the Tribe's claim based upon the consent of all parties." H.Rep. No. 1453, 95th Cong., 2d Sess. 6 (1978) reprinted in 1978 U.S.Code Cong. & Admin.News 1948, 1950. In particular, the terms of the settlement agreement provided:

(1) that the State would enact legislation creating a state-chartered, Indian-controlled corporation with an irrevocable charter for the purpose of permanently holding and managing the settlement lands in trust for the Narragansett Indians, id.;

(2) that the settlement lands would include approximately 900 acres of state-owned land and approximately 900 acres of privately held land, id.;

(3) that the public settlement land would be conveyed by the state without compensation, while the private settlement lands would be purchased at fair market value via an option mechanism with $3.5 million contributed by the federal government, id.;

(4) that the development and use of the settlement lands would be governed under a land use plan, incorporated into the Town zoning ordinance, which required all of the public settlement lands and 75 percent of the private settlement lands to be used for conservation purposes and which was otherwise mutually acceptable to the Charlestown Town Council and the state-created corporation, id. at 7;

(5) that the settlement lands would be subject to a special federal restraint against alienation and exempt from federal, state, and local taxation, except with respect to "in lieu" payments for governmental services provides by the town with respect to the lands, id.;

(6) that all laws of the state would continue in full force and effect on the settlement lands, but the state-created corporation would be given authority to establish its own hunting and fishing regulations on the settlement lands, id.;

(7) that the Narragansett Tribe of Indians agree to cause their lawsuits to be

dismissed with prejudice and consent to the extinguishment by the federal government of all Indian claims for possession of land within Rhode Island which would clear non-Indian title to non-settlement lands claimed by the Tribe, id.

The implementing legislation required of the United States Congress and the Rhode Island Legislature by this agreement was passed on September 30, 1978 and May 4, 1979 respectively. See Rhode Island Indian Claims Settlement Act, Pub.L. No. 95–395, 92 Stat. 813 (1978); Narragansett Indian Land Management Corporation Act, Pub.L. No. 1979, ch. 116, 1979 R.I.Pub. Laws 402. Plaintiffs do not take issue with either of these Acts passed pursuant to the agreement.

The federal legislation established a fund and set forth various provisions governing the purchase of the privately owned settlement lands. 25 U.S.C. sections 1703–07, 1710. In particular, the purchase and transfer of the private settlement lands was conditioned on the creation by the State of Rhode Island of a state chartered corporation pursuant to the terms of the settlement agreement. See 25 U.S.C. 1705–07. Moreover, this Act provided, *inter alia,* that "the settlement lands received by the State Corporation shall not be subject to any form of federal, state, or local taxation while held by the State Corporation." 25 U.S.C. section 1715(a). This exemption did not apply, however, "to any income-producing activities occurring on the settlement lands," 25 U.S.C. section 1715(b), nor did it "prevent the making of payments in lieu of taxes by the State Corporation for services provided in connection with the settlement lands." 25 U.S.C. section 1715(c).

The state legislation implementing the agreement "authorized, created and established a permanent, public corporation of the state having a distinct legal existence from the State and not constituting a department of state government." R.I.G.L. section 37–18–3 (1985 Reenactment). Under this Act, this corporation, which was created for the purpose of acquiring, man-aging and purchasing real property pursuant to the settlement agreement,

> shall consist of nine (9) directors, five (5) of whom shall be appointed by the Indian Corporation [the Narragansett Tribe], two (2) of whom shall be appointed by the Governor ..., one (1) of whom shall be appointed jointly by the Speaker of the House of Representatives, and by the majority leader of the Senate, and one (1) of whom shall be appointed by the Town Council.

*Id.* at section 37–18–5(b). Moreover, in accordance with the federal legislation, the state act exempted the settlement lands from any taxes or assessments. Instead the Act provided that

> [t]he Corporation shall make payments in lieu of real property taxes and assessments to the Town with respect to income-producing projects of the Corporation located in the Town and for police, fire, sanitation, health protection and municipal services provided by the Town to the real estate held by the Corporation in the Town. Such payments in lieu of taxes shall be in such amounts as shall be agreed upon by the Corporation and the Town.

*Id.* at section 37–18–9(b).

Subsequent to the passage of the Narragansett Indian Land Management Corporation Act of 1979, the Rhode Island legislature passed An Act Relating to the Narragansett Indian Land Management Corporation, Pub.L. No. 1985, ch. 386, 1985 R.I. Pub. Laws 912. It is with this latter Act that plaintiffs take issue. This statute amended the earlier one in two substantial respects. It provided for the expiration of the Narragansett Indian Land Management Corporation and for the transfer of the settlement lands to the Narragansett Tribe of Indians. The former was accomplished by section 37–18–12:

> 37–18–12. Expiration of the corporation.—Upon presentation of evidence to the Narragansett Indian Land Management Corporation and the Rhode Island Secretary of State that the Indian Corporation known as the Narragansett Tribe of Indians has applied for and been

granted by the United States Government pursuant to 25 U.S.C. section 1707 and 25 Code of Federal Regulations, Part 83, Federal recognition as an Indian Tribe with inherent rights, powers and responsibilities possessed by Indian Tribes in the United States, the Narragansett Indian Land Management Corporation shall expire thirty (30) days after the presentation of such evidence.

The latter was effected by sections 37–18–13 and 37–18–14. Section 37–18–13 stated:

37–18–13. Transfer of land to Indian tribe.—Upon presentation of such federal recognition to the Narragansett Indian Land Management Corporation and the Secretary of State, the Narragansett Indian Land Management Corporation shall forthwith transfer and convey to the federally recognized Narragansett Tribe of Indians all powers, authority, rights, privileges, titles, and interest it may possess to any and all real property acquired, owned, and held for the benefit of those individuals of Indian ancestry set forth in the list established pursuant to public laws, 1880 chapter 800, sec. 4, and thereafter, the Narragansett Indian Land Management Corporation shall have no further interest in said real property.

Section 37–18–14 provided:

37–18–14. Transfer of state land to the Indian tribes.—Upon presentation of such federal recognition to the Narragansett Indian Land Management Corporation and the Secretary of State, the Governor is authorized, empowered and directed to transfer, assign and convey to the Narragansett Tribe of Indians in fee simple all the right, title and interest of the state and to the following approximately nine hundred (900) acres of real estate located in the town;

(a) The Indian Cedar Swamp Management Area;

(b) Indian Burial Hill; and

(c) the State land around Deep Pond.

In most other respects, this amendment does not appear to alter the status quo. Rather than the Land Management Corporation, the Narragansett Tribe of Indians now has the right to make rules and regulations regarding fish and game conservation on the settlement lands provided that this is done in consultation with the director of environmental management and that minimum standards for the safety of persons and the protection of wildlife and fish stock are imposed. Section 37–18–8. Rather than the Land Management Corporation, the Narragansett Tribe of Indians is not required to pay any taxes or assessments upon or in respect to any of the settlement lands levied by the Town, but is required to make payments in lieu of real property taxes and assessments to the Town with respect to income-producing projects of the Tribe and for police, fire, sanitation, health protection and municipal services provided by the Town to the settlement lands; these payments being made in amounts agreed upon by the Narragansett Tribe and the Town. Section 37–18–9. Moreover, the settlement lands will still be subject to a land use plan and, unless otherwise provided, to all the criminal and civil laws of the State and the Town. Sections 37–18–10, 37–18–11. As the amendment states in summary fashion:

All real property transferred by the Narragansett Indian Land Management Corporation to the federally recognized Narragansett Tribe of Indians pursuant to this provision:

(a) shall be subject to the same conditions, restrictions, limitations, or responsibilities set forth in sections 37–18–6(m)(ii) and (m)(iii), 37–18–8, 37–18–9, 37–18–10, and 37–18–11 hereof as are applicable to the corporation and all its authorized activities.

(b) shall be subject to the civil and criminal laws of the state of Rhode Island and the town of Charlestown, Rhode Island, except as otherwise provided herein.

Section 37–18–13.

Concerning these latter points, it should be observed that this amendment does affect the *federal* tax exempt status of the settlement lands. Under the Rhode Island Indian Claims Settlement Act, "the settlement lands received by the State Corpora-

tion [the Land Management Corporation] shall not be subject to any form of Federal, State, or local taxation *while held by the State Corporation.*" 25 U.S.C. section 1715(a) (emphasis added). Accordingly, while the state and local tax exemptions are kept in force by the state legislation amending the Narragansett Indian Land Management Corporation Act, the transfer of the settlement lands from the Land Management Corporation to the Narragansett Tribe of Indians does effectively end their tax exempt status under the operative language of the federal statute: the lands are no longer held by the State Corporation.

Since the passage of the challenged amendment by the Rhode Island legislature, according to plaintiffs, the Narragansett Tribe of Indians has applied for and been granted by the United States Government pursuant to 25 U.S.C. section 1707 and 25 C.F.R., Pt. 83, federal recognition as an Indian Tribe with the inherent rights, powers and responsibilities possessed by Indian Tribes in the United States. As a result, the settlement lands held by the Narragansett Indian Land Management Corporation and by the State of Rhode Island have been transferred to the Narragansett Tribe of Indians and the Land Management Corporation has expired. Moreover, according to plaintiffs, the Narragansett Tribe of Indians have submitted and now have pending before the Department of the Interior pursuant to 25 U.S.C. sections 464 and 465, an application for permission to transfer the settlement lands to the United States in order that these lands be held in trust for the Tribe.

Believing that they will be immediately and irreparably harmed if this application for trust status is granted, plaintiffs have entered this court and prayed for relief.

### The Requested Relief

Plaintiffs have made 17 different demands for relief, correlating each demand with a separate letter of the alphabet, beginning with "A" and ending with "Q". In spite of this abecedarian diversity, plaintiffs' demands can be reduced to two related claims.

Plaintiffs argue that the settlement agreement constitutes a contract [A] and that the 1985 amendment to the Narragansett Indian Land Management Corporation Act by the Rhode Island legislature violates this contract [B]. Accordingly, plaintiffs claim that the State of Rhode Island has violated the contract clause, Art. I, section 10, of the United States Constitution and the analogous clause, Art. I, section 12, in the Rhode Island Constitution [C]. To correct this constitutional violation, plaintiffs request this court to declare the transfer of settlement lands to the Narragansett Tribe of Indians pursuant to section 37–18–13, and section 37–18–14 null and void and re-establish the status quo ante [section 37–18–13: D, I, J; section 37–18–14: E, F, K]. Moreover, plaintiffs request this court to order that the Narragansett Land Management Corporation be reactivated [G] and that, in compliance with the settlement agreement, the title to the settlement lands be held by it in perpetuity [L].

Plaintiffs also request this court to declare that the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island and the local ordinances of the Town of Charlestown [N]. Such a declaration by this court, however, would be wholly redundant because the challenged amendment itself, in sections 37–18–13, 37–18–14 and 37–18–11, contains this declaration. Similarly unnecessary is plaintiffs' request that this court declare that the Town of Charlestown shall provide municipal services to the settlement lands only if the Town is reimbursed for the costs of such services by the Narragansett Tribe [O]. Section 37–18–13 mandates that the Narragansett Tribe is subject to many of the same obligations that the Narragansett Indian Land Management Corporation had been subject with respect to the settlement lands and that, in particular, the Tribe is required to make payments in lieu of taxes to the Town pursuant to section 37–18–9(b). This provision also renders unnecessary plaintiffs' request for an injunction enjoining any de-

velopment of the settlement lands until a land use plan is accepted by the Town Council of the Town of Charlestown [M]. Section 37–18–13 specifically states that the Narragansett Tribe of Indians is subject to section 37–18–10 and this latter section requires that a land use plan be accepted by the Town before any use can be made of the settlement lands. Accordingly, these three demands for relief will not be further considered.

Nor will this court consider plaintiffs' request for an injunction enjoining the United States of America, the Department of Interior, the Bureau of Indian Affairs and the individual defendants Secretary Hodel, Assistant Secretary Swimmer and Eastern Area Office Director Ott from acting upon the application for trust status submitted by the Narragansett Tribe of Indians [H]. On this matter, plaintiffs have reached an agreement with the other parties during a conference before this court on November 9, 1987. Recognizing that this agreement obviates the need for the requested injunction, plaintiffs have withdrawn the request. Hearing before the Hon. Raymond J. Pettine, at 5 (November 9, 1987). In lieu of an injunction the relevant defendants have represented to plaintiffs before this court that they will be given sufficient notice before any action is taken upon the application of the Narragansett Tribe. *Id.*

Plaintiffs end their catalogue of desired relief by requesting costs and fees [P] as well as any other relief that this court declares just and proper [Q].

In sum, the only federal claim that remains before this court upon which relief can be predicated is the alleged violation of the contract clause of the United States Constitution by the State of Rhode Island. Against this claim, however, it is asserted that plaintiffs have no standing to proceed. The standing of the Town of Charlestown and the councilmen will be considered in turn.

### Municipal Standing

The Town of Charlestown claims standing under the contracts clause of the Unit-

ed States Constitution to challenge a statute enacted by the Rhode Island legislature. It is legion in constitutional law that the standing of a creature of a state to sue the state that created it is severely limited. "Political subdivisions generally are held to lack constitutional rights against the creating state." Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d section 3531.11. In particular "[m]unicipal corporations have regularly been denied standing in the federal courts to attack state legislation as violative of the federal Constitution, on the ground that they have no rights against the state of which they are a creature." Hart & Wechsler, The Federal Courts and the Federal System 182 (2d ed.1973).

■ The specific question whether a municipality has standing under the contracts clause of the United States Constitution to challenge a statute enacted by the state of which it is a subdivision has been ruled upon many times by the Supreme Court. Each time the Court has offered the same response: a municipality lacks standing. While this stricture on municipal standing may be relaxed when a municipality acts in its private and proprietary capacity, the rule is absolute when a municipality acts with public and governmental purpose. In the present case, the Town has not asserted any private or proprietary interest that has been infringed. The challenged legislation and the settlement agreement it affects concern only the conveyances of lands within the township and the rights and duties of the Town with respect to the provision of police, fire, sanitation, health protection and other municipal services to these lands. The clear public character of the municipal rights and interests affected leaves no doubt that the Town of Charlestown contests this statute in its public and governmental capacity. Accordingly, it does not even present an arguable case that it has standing.

The basic principles from which this rule emerges were set forth with great clarity and force by the Supreme Court in *Hunter v. Pittsburgh,* 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907). Therein, Justice Moody,

writing for the Court, states that "[w]e think the following principles have been established by [earlier Supreme Court decisions] and have become settled doctrines of this court, to be acted upon wherever they are applicable." *Hunter v. Pittsburgh,* 28 S.Ct. at 46. The principle from which he begins is that "[m]unicipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be intrusted to them." *Id.* Accordingly, Justice Moody continues, "[f]or the purpose of executing these powers properly and efficiently they usually are given the power to acquire, hold, and manage personal and real property." *Id* Moreover, given the nature and purpose of municipal corporations, it follows that "[t]he number, nature, and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the state." *Id.* Amplifying this point, Justice Moody notes that "[n]either their charters, nor any law conferring governmental powers, or vesting in them property to be used for governmental purposes, or authorizing them to hold or manage such property, or exempting them from taxation upon it, constitutes a contract with the state within the meaning of the Federal Constitution." *Id.* From these reflections the inference is drawn that "[t]he state, therefore, at its pleasure, may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation," and that "[a]ll this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protests." *Id.* Reasoning thus, Justice Moody reaches the ineluctable conclusion that "[i]n all these respects the state is supreme, and its legislative body, conforming its action to the State Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States." *Id.* In the final analysis, "[t]he power is in the state, and those who legislate for the state are alone responsible for any unjust or oppressive exercise of it." *Id.* 28 S.Ct. at 47.

The rule that a municipal corporation cannot challenge a state statute as violative of the contract clause of the United States Constitution was set out with even greater brevity in *Pawhuska v. Pawhuska Oil & Gas Co.,* 250 U.S. 394, 39 S.Ct. 526, 63 L.Ed. 1054 (1919). In that case, the Supreme Court considered whether a state statute that effected an impairment of a franchise contract between a city and a gas company was in violation of the contract clause of the Constitution of the United States. Quoting the reasoning of Justice Moody in *Hunter* to justify its decision, the Court held that "no question under the contract clause of the Constitution of the United States is involved, but only a question of local law, the decision of which by the Supreme Court of the State is final." *Pawhuska,* 250 U.S. at 397, 39 S.Ct. at 257. Three years later this rule was deemed so well settled that the Supreme Court could write in *Trenton v. New Jersey,* 262 U.S. 182, 43 S.Ct. 534, 537, 67 L.Ed. 937 (1922), that "[t]he power of the state, unrestrained by the contract clause or the Fourteenth Amendment, over the rights and property of cities held and used for 'governmental purposes' cannot be questioned." *See also Williams v. Mayor,* 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933) (Cardozo, J.).

In *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), the Supreme Court formulated this rule explicitly in terms of standing. Therein, Chief Justice Hughes, writing for the Court, stated that "[b]eing but creatures of the State, municipal corporations have no standing to invoke the contract clause ... of the Constitution in opposition to the will of their creator." *Coleman v. Miller,* 307 U.S. at 441, 59 S.Ct. at 976. *See also Ball v. Rapides Parish Police Jury,* 746 F.2d 1049, 1051 n. 1 (5th Cir.1984).

In light of the foregoing, the decision this court must reach is clear. Bound by precedent and convinced by reason, this court holds that the Town of Charlestown

lacks standing to challenge the Rhode Island legislation that it claims is in violation of the contract clause of the Constitution of the United States.

### Residential Standing

Beside the Town of Charlestown, two councilmen of the Town Council of the Town of Charlestown participate as plaintiffs in the present action. These two councilmen claim standing both as residents and as officials of the Town of Charlestown. Each of these theories of standing will be considered in turn.

■ As residents of the Town of Charlestown, the councilmen claim that they have standing because of their interest "in ending unlawful activities which will impact upon land use regulation, revenue collection, enforcement of laws and ordinances, and the quality of life in the Town in which each resides." Plaintiffs' Memorandum In Opposition To Motion To Dismiss, at 9. This court cannot help but express its bewilderment at plaintiffs' description of the impact of the challenged legislation. As already noted, the allegedly unconstitutional statute does not alter the Town's position with respect to land use regulation, revenue collection or the enforcement of laws and ordinances. Sections 37–18–11, 37–18–13 and 37–18–14 impose the same conditions and restrictions on the Narragansett Tribe of Indians as had been imposed on the Narragansett Land Management Corporation. Accordingly, it appears that the only grievance that the residents assert is that the contested legislation will affect the quality of life in the town in which they reside. Nonetheless, even if their description of the challenged statute's impact is accepted, still the residents complaints amount to only generalized grievances and as such are insufficient to support standing.

The Supreme Court has held on many occasions that "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct.

2197, 2205, 45 L.Ed.2d 343 (1975) citing *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Ex parte Levitt,* 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937). The "generalized interest of all citizens in constitutional governance," when infringed by the passage of an unconstitutional statute by the legislature, is too abstract an injury to support standing. *Schlesinger,* 94 S.Ct. at 2930. " '[G]eneralized grievances' about the conduct of Government," *id.,* provide a basis neither for taxpayer standing, *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), nor for citizen standing. *Schlesinger,* 94 S.Ct. at 2933. "Such a generalized interests ... is too abstract to constitute a 'case or controversy' appropriate for judicial resolution." *Id.* at 2935.

This court is unable to discern any material or relevant difference between the level of generality or abstractness of a resident's interest in constitutional governance and the generalized interests of taxpayers and citizens. Accordingly, this court is compelled to determine that the councilmen lack standing as residents of the Town of Charlestown. The Supreme Court has repeatedly "refrained from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982) quoting *Warth v. Seldin,* 95 S.Ct. at 2205–06. "Slow, cumbersome, and unresponsive though the traditional electoral process may be thought at times, our system provides for changing members of the political branches when dissatisfied citizens convince a sufficient number of their fellow electors that elected representatives are delinquent in performing duties committed to them." *United States v. Richardson,* 94 S.Ct. at 2948.

Nor is this court the first one to find that residents as such lack standing to bring a constitutional challenge. In an action

brought by residents to contest the constitutionality of a sale of municipal property to a religious organization for a single dollar, the District Court for the District of Connecticut found plaintiffs' status as residents insufficient to support standing. Therein, the court noted that "[w]hile all residents may suffer from diminished municipal services because of the allegedly unconstitutional transaction, that possibility is too remote and speculative to constitute actual injury for purposes of standing." *Annunziato v. New Haven Board of Aldermen,* 555 F.Supp. 427, 431 (D.Conn.1982).

Mindful that "[a]bstract injury is not enough," *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974), and that a plaintiff must allege that he " 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct," *id.,* this court turns to consider the contention of the councilmen that they have standing as officials of the Town of Charlestown.

### Official Standing

As Town officials, the councilmen claim that they have standing because the challenged state statute forces them into an irresolvable dilemma: either they must violate their oaths as Town officials to support the Constitution of the United States or refuse to perform their duties pursuant to state law and face possible expulsion from office. This dilemma, they claim, is sufficient to grant them standing.

To support this theory of standing, plaintiffs invoke the opinion of the Supreme Court in *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). Prior to *Allen,* it was indisputable that state officials did not have a sufficient interest in vindicating the Constitution of the United States to allow them standing to challenge the constitutionality of a state statute they were charged with enforcing. *Columbus & Greenville Ry. v. Miller,* 283 U.S. 96, 51 S.Ct. 392, 75 L.Ed. 861 (1931); *Braxton County Court v. West Virginia,* 208 U.S. 192, 28 S.Ct. 275, 52 L.Ed. 450

(1908); *Smith v. Indiana,* 191 U.S. 138, 24 S.Ct. 51, 48 L.Ed. 125 (1903). In *Allen,* however, members of a school board were granted standing to challenge the constitutionality of a state statute that required them to lend textbooks at no cost to students attending parochial schools. Therein, the Supreme Court disposed of the standing question in a footnote:

Appellees do not challenge the standing of appellants to press their claim in this Court. Appellants have taken an oath to support the United States Constitution. Believing section 701 [the challenged statute] to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step—refusal to comply with section 701 —that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a "personal stake in the outcome" of this litigation. *Baker v. Carr,* 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663] (1962).

*Board of Education v. Allen,* 392 U.S. at 241 n. 5, 88 S.Ct. at 1925 n. 5.

Beginning an evaluation of plaintiffs' authority, this court can do no better than to borrow the language of the Ninth Circuit in *City of South Lake Tahoe v. California Tahoe Regional Planning Agency,* 625 F.2d 231 (9th Cir.), *cert. denied* 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980). Therein, the Ninth Circuit wrote, "[w]ere *Allen* the last word from the Supreme Court on standing, we could simply adopt the rationale of the quoted footnote and determine that the councilmembers in the case before us have standing on the basis that they believe that enforcing the [challenged state statute] would violate their oaths of office." *City of South Lake Tahoe v. California Tahoe Regional Planning Agency,* 625 F.2d at 236. As the Ninth Circuit went on to observe, however, the quoted footnote was not the last word from the Supreme Court on standing. This court joins in that observation.

Since *Allen,* the Supreme Court has tightened the requirements of standing.

On the one hand, the Supreme Court has made it pellucidly clear that abstract interests and generalized grievances are not sufficient to support standing. *Schlesinger v. Reservists Committee to Stop the War, supra; United States v. Richardson, supra.* On the other hand, the Supreme Court has recently emphasized that "[t]he injury or threat of injury must be both 'real and immediate', not 'conjectural' or 'hypothetical.'" *O'Shea v. Littleton, supra,* quoting *Golden v. Zwickler,* 394 U.S. 103, 109–10, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969); *see also Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983). It is against these twin requirements of standing that the twin horns of the councilmen's dilemma must be evaluated.

Essentially, a dilemma creates standing because either of the two possible actions available to the plaintiff will result in injury sufficient to support standing. By definition, a dilemma does not permit plaintiff a third course of action by which he could avoid the threatened injuries. Accordingly, this court must consider whether the injury that would result from each horn of the councilmen's dilemma would be sufficient to support standing as well as whether any other course of action is available to the councilmen that would permit them to avoid the threatened injuries.

Elucidating the first horn of their dilemma, the councilmen explain that each of them has sworn an oath to uphold the Constitution of the United States and that each of them believes that it would be a violation of that oath "to recognize a patently unconstitutional state law." Plaintiffs' Memorandum in Opposition to Motion to Dismiss, at 8. While the seriousness with which the councilmen take their oath of office is laudable, this court is forced to admit that it fails to perceive what direct and palpable injury will befall the councilmen should they recognize a validly enacted law as law.

This court acknowledges the abstract psychic injury one can experience when self-reproached for acting against the dictates of one's own conscience. Moreover, this court further acknowledges the severe moral gravity of the diminution in self-respect and self-worth that often accompanies such condemnations of self. Nonetheless, this court does not believe that the censures of conscience are sufficient to constitute the injurious consequences contemplated by the Supreme Court when it articulated the injury in fact requirement of Article III. As the Ninth Circuit observed in a similar case in which it denied standing, "[n]o consequences, save these of conscience self-imposed by the councilmembers' personal beliefs, flow from the violation of the oath in performance of a statutory duty." *City of South Lake Tahoe v. California Tahoe Regional Planning Agency,* 625 F.2d at 237. In short, a controversy between the Super ego and the Id is not justiciable.

■ The councilmen's censures of conscience stem from an honest and sincere disagreement with the Rhode Island Legislature over a matter of constitutional principle. Nonetheless, disagreement over constitutional principles and outrage at legislative enactments that conform to those principles with which one disagrees are not sufficient to generate standing to contest those enactments. While every individual who lives within our constitutional democracy has an interest in furthering constitutional interpretations which conform to one's personal commitments and beliefs, as myriad constitutional scholars will lamentingly admit, such an interest is too general and abstract to meet the minimum constitutional mandate of Article III. "The lesson of *Schlesinger* and *Richardson* is that constitutional principle divorced from concrete injury may suffice to generate a spirited legislative or public debate, but will not support a federal case." *Id.* at 238. "As Professor Davis has put it: 'The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation.'" *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412

U.S. 669, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973) quoting Davis, Standing: Taxpayers and Others, 35 U.Ch.L.Rev. 601, 613 (1968). Here, however, the councilmen have not articulated even a direct and palpable trifle.

■] The councilmen characterize the second horn of their dilemma as a kind of conscientious objection. The councilmen claim that were they to act in accord with the dictates of their own conscience and not violate their oath of office, they would refuse to obey or carry out the effect of the contested state law and would "face possible expulsion from office or other official sanction." Plaintiffs' Memorandum in Opposition to Motion to Dismiss, at 8. Accordingly, it must be considered whether this possibility of expulsion from office or other official sanction is sufficient to confer standing upon the councilmen. This court believes that the councilmen's alleged injury is deficient in two respects.

In *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976), the Supreme Court stated that the "case or controversy" limitation of Article III "requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant...." In *Simon*, the Supreme Court was confronted with a Revenue Ruling which announced an Internal Revenue Service policy of extending favorable tax treatment under the Internal Revenue Code of 1954 to hospitals that did not serve indigents to the extent of the hospitals' financial ability. The plaintiffs claimed that they and other indigents were injured by this Ruling because it "encouraged" hospitals to deny medical services to indigents. The Supreme Court ruled, however, that this injury was not sufficient to confer standing because the plaintiffs had failed to carry the burden of showing that their injury was the consequence of the revenue ruling. The Supreme Court noted that "[i]t is purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without

regard to the tax implications." *Simon*, 96 S.Ct. at 1926. In other words, because the decisions which proximately caused plaintiffs' injuries intervened between defendant's action and plaintiffs' injuries, these injuries could not be fairly traced to defendant's action. The same decisions could have been made and the plaintiffs injured, even if the defendant had not acted in the challenged manner.

In the present case, a decision similarly stands between defendant's action and the threat of injury. The choices and decisions of the councilmen themselves determine the possibility of their expulsion from office for failing to obey the contested law. If they choose to obey this validly enacted law, the possibility of their expulsion for failing to obey it is null. If they choose to disobey this law, then the possibility exists. Accordingly, the threatened injury cannot be fairly traced to the passage of the contested legislation, but only to the decisions and choices of the councilmen themselves. In this respect, the councilmen are not unlike other publicly-minded individuals who engage in civil disobedience because of their commitment to principle. Neither the councilmen, nor these other publicly-minded individuals have standing to challenge the constitutionality of a law because of the possibility that official sanctions might be imposed upon them if they decide to act upon those principles.

■ Even if this court believed that the injury which threatened the councilmen was fairly traceable to the defendant's action, still the councilmen must be found to lack standing. The deficiency of the councilmen's case is contained in their own description of it. The councilmen assert that if they refuse to obey or carry out the effect of the contested state law, they "face *possible* expulsion from office or other official sanction." Plaintiffs' Memorandum in Opposition to Motion to Dismiss, at 8 (emphasis added). The councilmen do not claim that the threat of their expulsion from office or other official sanction is real and immediate. They assert only that there is a possibility that they will be ex-

pelled or sanctioned. This, however, is not enough.

The Supreme Court has stressed on numerous occasions that "the injury or threat of injury must be both 'real and immediate', not 'conjectural' or 'hypothetical.'" *O'Shea v. Littleton, supra; Golden v. Zwickler, supra; Allen v. Wright, supra; City of Los Angeles v. Lyons, supra.* Here, the councilmen have only *conjectured* that they *might* be expelled from office or sanctioned. The presentation of a hypothetical in which the councilmen are expelled from office or sanctioned, however, does not meet the Supreme Court's standard for standing. Accordingly, this court must find that the injury threatened by the second horn of the councilmen's dilemma, being but a conjectured possibility, is insufficient to confer standing upon them.

For a dilemma to support standing, both horns of that dilemma must individually result in injury or threat of injury sufficient to support standing. In the present case, however, neither horn of the councilmen's dilemma has been found to result in injury or threat of injury sufficient to support standing. Nonetheless, even if neither horn of the councilmen's dilemma were defective, still the councilmen would lack standing. The councilmen have failed to assert a true dilemma.

As already noted, a dilemma exists when a plaintiff is confronted with only two courses of action, both of which result in undesired consequences. A true dilemma does not permit the plaintiff a third course of action by which he could avoid the threatened injuries. In the present case, however, a third course of action does exist: resignation with honor. See *City of South Lake Tahoe v. California Tahoe Regional Planning Agency, supra* (Sneed, J., concurring). By resigning with honor, the councilmen can steer between the scylla of violating their oath of office and the charybdis of refusing to recognize a validly enacted law. In this fashion, the councilmen could avoid the abstract and psychic injuries that can ensure when one transgresses the dictates of one's own conscience as well as the possibility of their expulsion from office or other official sanction together with the public opprobrium that often attaches to such sanctions.

The history of our nation is replete with examples of resignation with honor. Too well-known to require citation are those occasions when public officials of principle and honor have been required to act in a manner that they believed improper under the constitutional scheme of our government. Rather than undertake those acts, these individuals resigned. This court firmly believes that the same strength of character and commitment to public virtue found in those individuals serving our country at the highest levels of the federal government can also be found in the dedicated officials who serve the citizens of our land at the municipal level. Resignation with honor is an act of strength, not of cowardice, and provides a resolution to the otherwise irresolvable.

### Order

For the foregoing reasons, the plaintiffs in the present action are found to lack standing to proceed before this court on their federal claim. Moreover, because no federal claim survives in this case, this court declines to consider plaintiffs' pendant state constitutional claim. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1965). Accordingly, defendant's Motion to Dismiss is granted. The case is dismissed as to all defendants.

So ordered.