**BANNUM, INCORPORATED, Plaintiff–Appellant,**

v.

**TOWN OF ASHLAND, Defendant–Appellee.**

**No. 90–1411.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 3, 1990.
Decided Dec. 18, 1990.

Joseph William Kaestner, Kaestner, Galanides and Spieth, Richmond, Va., for plaintiff-appellant.

Larry Ellis Gilman, Johnson, Gilman & Stacey, Ashland, Va., for defendant-appellee.

Before CHAPMAN and NIEMEYER, Circuit Judges, and BUTZNER, Senior Circuit Judge.

NIEMEYER, Circuit Judge:

Bannum, Inc., a business which operates half-way houses throughout the country under contracts with the United States Bureau of Prisons, had been advised by the Bureau of Prisons that it would receive a contract to operate a half-way house in the Town of Ashland, Virginia. The Bureau of Prisons, however, notified Bannum that it would not finalize the contract for operation of the Ashland facility because the Town of Ashland had withdrawn its requisite approval to have the facility there. Having lost the approval of Ashland and therefore the anticipated contract with the Bureau of Prisons, Bannum sued the Town of Ashland under 42 U.S.C. § 1983, contending that Ashland deprived Bannum of property and liberty interests without due process in violation of the Fourteenth Amendment and impaired its contractual rights in violation of Art. 1, § 10, cl. 1 of the United States Constitution. On review of the district court's dismissal of the complaint, we affirm.

## I.

In 1989, Bannum submitted a proposal to the Bureau of Prisons to operate a community correctional center, or half-way house, at the Kings Budget Inn in Ashland, Virginia. It intended to rent apartments on a daily basis from Kings Budget Inn as needed. After Ashland gave its approval, which was required by the Bureau of Prisons before it awarded a contract, the Bureau of Prisons notified Bannum by letter dated May 10, 1989, that Bannum's proposal had been "selected" subject to administrative reviews and approvals which were unrelated to the approval given by Ashland. The letter stated further:

This notification does not constitute award of a contract.

The contract shall be effective from the date of award, which is projected for July 1, 1989, with the base year running until December 31, 1989, and each option year beginning January 1. The exercise of the option year is a unilateral right of the Government in accordance with the terms of this contract. Your firm must be ready to begin performance on the date of award.

(J.A. 11.)

Pending finalization of the contract, the Bureau of Prisons issued 30–day purchase orders to Bannum to fund operation of the half-way house and Bannum began housing inmates at the Kings Budget Inn. During this interim period, three of the inmates were arrested on three separate occasions for unrelated offenses. Ashland officials began to express concern for the "safety and welfare of the citizens of Ashland" and the Town Council decided to request that the Bureau of Prisons either discontinue the program or tighten its control over the inmates and select "white-collar" inmates. The town wrote to the Bureau of Prisons:

[T]he Council is hereby requesting the Bureau of Prisons terminate this operation within Ashland as soon as possible.

Failing that, we would ask that the level of supervision of residents be improved immediately, that no long-term contract be entered into for the operation of this program without review by Town Council, that any violations of law or rules of conduct be reported to the Ashland Police Department within twenty-four hours and the Police Department continue to receive information pertaining to the operation as needed.

(J.A. 21.)

In response to the concerns of Ashland, the Bureau of Prisons informed Bannum that it would not proceed with its plans to fund a facility at the Kings Budget Inn in Ashland, but it stated that Bannum could submit proposals for alternative sites. Bannum immediately filed suit in the district court to obtain a temporary restraining order. The district court denied the restraining order and dismissed the action. This appeal followed.

## II.

Bannum contends that it had a property interest in the executory agreement with

the Bureau of Prisons which was protected by the Fourteenth Amendment because all that stood in the way of finalization of the contract was governmental "red tape" unrelated to the continued approval of Ashland. According to Bannum, "the BOP [Bureau of Prisons] evidenced its intention to make the contract final by permitting Bannum to establish the Community Correctional Center [half-way house] and take on residents. Bannum had commenced performance of the contract and this action was ratified by the BOP when the BOP accepted and paid Bannum for these services." Brief of Appellant at 8.

Undoubtedly, Ashland's withdrawal of approval led to the Bureau of Prisons' change of position and, for purposes of this discussion, it can be assumed that the change injured Bannum's business. Before Bannum may seek the protection of the Fourteenth Amendment, however, it must show that Ashland deprived it of a property or liberty interest.

■■■ The Fourteenth Amendment does not grant property interests; rather, it protects those interests, derived from an independent source, from deprivation by the state without due process. The nature and extent of a property interest is determined by "existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). It is well settled that property interests which are protected extend beyond ownership of tangible property and include those interests that "a person has already acquired in specific benefits." *Id.* at 576, 92 S.Ct. at 2708. As the Court in *Roth* noted:

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Id.* at 577, 92 S.Ct. at 2709. Thus, in determining whether Bannum had a property interest of which it was deprived by the Town of Ashland, we must focus on whether Bannum could legitimately claim an entitlement in the continuation of the approval for a half-way house that had been given by Ashland.

Ashland sent Bannum a letter dated April 5, 1989, which provided:

The Town of Ashland will allow the U.S. Bureau of Prisons to operate a Transitional Center under contract to Bannum Enterprises, Inc. at Kings Budget Inn, 101 South Carter Road within the Town of Ashland.

Please advise if further information is desired.

(J.A. 10.)

This approval was given pursuant to an informal request without the payment of a fee. No underlying ordinance, rule or procedure applied to the application for or the grant of the approval, and no other term or condition attached by operation of law or by understanding. The approval was a simple statement, "we approve," without more. Moreover, nothing in the record suggests that Ashland could not have unilaterally withdrawn the approval at any time. Certainly, mere reliance on the approval did not elevate Bannum's interest in it to an entitlement.

Therefore, when Ashland withdrew its approval of the location at the Kings Budget Inn for use as a half-way house, it breached no law or understanding between the parties. Bannum, no doubt, did not expect the withdrawal and planned for a longer term, but it could not, by any principle of property law, contract law or other independent source, enforce a longer term.

Bannum's claim to a loss of entitlement becomes more attenuated by the fact that it never consummated a contract with the Bureau of Prisons. Although the Bureau of Prisons had expressed its intent to enter into a formal contract with Bannum, and even had issued 30-day purchase orders to Bannum to finance operations in the interim, Bannum has conceded that no contract was signed because the administrative approval process had not yet been completed. The Bureau of Prisons could have refused to proceed with the contract for some unforeseen administrative reason at any time prior to finalization of the agreement.

In short, while Bannum may have identified a well-founded expectancy which was frustrated by Ashland's actions, this expectancy does not rise to the level of a property interest protected by the Fourteenth Amendment.

## III.

■ Bannum also contends that Ashland deprived it of a liberty interest without due process because Ashland denied Bannum a *de facto* license. Bannum argues that Ashland's approval of a half-way house was a condition to Bannum's ability to contract with the Bureau of Prisons and thereby take advantage of a business and employment opportunity. Ashland's power to withhold its approval, therefore, is equivalent to a power to withhold a business opportunity and amounts to a *de facto* licensing power. Accordingly, Bannum argues, "[s]ince the right to hold specific employment forms a constitutionally protected liberty interest, and since this de facto license to operate Bannum Place in Ashland created such a business and employment opportunity for plaintiff, plaintiff's interest in Bannum Place is a liberty interest within the ambit of the Fourteenth Amendment." Brief of Appellant at 11. This argument, however, mischaracterizes the nature of a liberty interest.

■ While "property" protected by the Fourteenth Amendment includes actual and existing benefits and entitlements, "liberty" protected by the Amendment includes freedom of movement and action and encompasses a right *to pursue* benefits and entitlements. *See Roth*, 408 U.S. at 572, 576, 92 S.Ct. at 2706, 2709. Therefore, when Bannum argues that Ashland's withdrawal of approval deprived it of a liberty interest by denying it a business and employment opportunity, it must be contending that Bannum was denied the freedom and right *to pursue* a business or *to seek* employment, for the deprivation of an *existing* benefit or entitlement is by definition a deprivation of property, not liberty. It is the impairment of the *ability* to take action that is protected as a liberty interest. Thus, when a "person's good

name, reputation, honor, or integrity is at stake because of what the government is doing to him," a liberty interest is implicated. *Wisconsin v. Constantineau*, 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971). The mere denial of a business or employment opportunity, without more, does not deprive a person of a liberty interest, for the ability to obtain future business or employment opportunities is not jeopardized. As the Court in *Roth* stated:

> [T]here is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities.

408 U.S. at 573, 92 S.Ct. at 2707. The Court added, "It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." *Id.* at 575, 92 S.Ct. at 2708.

Bannum simply lost an approval previously given by Ashland. No action by Ashland impaired Bannum's *ability* to pursue a business or to seek employment. Indeed, Bannum could have renegotiated the contract that it had planned for the Kings Budget Inn at a different location. (J.A. 42.)

Bannum argues that a custom of *de facto* licensing of a common occupation may implicate a liberty interest in a given circumstance. Brief of Appellant at 10–13, discussing *Phillips v. Vandygriff*, 711 F.2d 1217 (5th Cir.1983), *cert. denied*, 469 U.S. 821, 105 S.Ct. 94, 83 L.Ed.2d 40 (1984) (plaintiff's exclusion from holding a managerial position with *any* savings and loan association in the state of Texas implicated a liberty interest). This case, however, does not present such a circumstance. *Cf. Asbestec Constr. Serv., Inc. v. EPA*, 849 F.2d 765, 769 (2d Cir.1988) (EPA compliance order which might have adversely affected plaintiff's future business prospects did not implicate a liberty interest).

## IV.

Since the Court has determined that Bannum has no protected property or liberty

interest in the approval that was withdrawn by the Town of Ashland, it need not resolve whether due process was in fact provided. It is worth noting, however, that the Executive Director of Bannum knew beforehand that the Ashland Town Council planned to vote on a resolution that might result in a decision to withdraw approval of the facility and that he in fact attended the meeting and was given an opportunity to present the views of Bannum on the issue. It is also noteworthy that when the Town Council wrote its letter to the Bureau of Prisons, it recommended that the Bureau of Prisons terminate the facility or *in the alternative* that (1) supervision over the inmates be improved, (2) no long-term contract be entered into without review of the Town Council, and (3) all violations by inmates be reported to the Ashland Police Department. Furthermore, when the Bureau of Prisons refused to finalize the contract for the Kings Budget Inn location, it invited Bannum to submit a proposal for another location. All of these facts demonstrate that Bannum not only had the opportunity to express its views on the decision made by the Town Council but also had an invitation to develop alternatives to overcome any adverse effects caused by the withdrawal of approval. Rather than accept this invitation, Bannum filed suit in the district court.

### V.

Finally, Bannum argues that the resolution by the Town of Ashland that resulted in the letter of disapproval to the Bureau of Prisons constituted legislative action that "had the effect of impairing a contractual obligation owed to plaintiff" and that the regulation had no significant and legitimate public purpose. Brief of Appellant at 16–17. Therefore, Bannum argues, Ashland violated the Contract Clause, U.S. Const. Art. 1, § 10, cl. 1, which precludes a state from passing any "Law impairing the Obligation of Contracts."

■ Even if Bannum's executory agreement with the Bureau of Prisons had matured to a contract, thereby allowing it

to assert a contract right, it would still need to show that the legislation constituted a severe impairment of the right. *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 245, 98 S.Ct. 2716, 2723, 57 L.Ed.2d 727 (1978) ("The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage."). A severe impairment is one where the legislation alters the terms of a contract by effectively imposing on one of the parties an obligation which it had not reasonably anticipated or relieving a party of a contractual obligation. *Id.* at 244–46 & n. 16, 98 S.Ct. at 2722–23 & n. 16.

In this case, when Ashland had withdrawn its approval for the particular location at the Kings Budget Inn, Bannum was given the opportunity to pursue another location. Nothing in the record suggests that Bannum had such an investment in the particular location of the Kings Budget Inn that an unreasonable burden would be borne if it considered another location.

■ Even if Bannum had identified a severely impaired contract right within the scope of protection afforded by the Contract Clause, that right would still be subject to the overriding police power of the state.

> Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while,—a government which retains adequate authority to secure the peace and good order of society.

*Home Bldg. & Loan Assn. v. Blaisdell,* 290 U.S. 398, 435, 54 S.Ct. 231, 239, 78 L.Ed. 413 (1934); *see also Hudson County Water Co. v. McCarter,* 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908) (Holmes, J.) ("One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the

State by making a contract about them. The contract will carry with it the infirmity of the subject matter."). Ashland's expressed interest in protecting its citizenry from a perceived increase in exposure to crime was sparked by the arrest of three inmates of the half-way house on separate occasions for crimes unrelated to those that required their initial internment. This interest was a valid concern for the good of the society that justified an exercise of police power. *See Allied Structural Steel,* 438 U.S. at 241, 98 S.Ct. at 2720.

In no respect, therefore, do we find a violation of the Contract Clause by Ashland.

For the reasons given, the dismissal of the complaint of Bannum by the district court is hereby

AFFIRMED.