57 F.3d 385
 63 USLW 2790
 CITY OF CHARLESTON; The City of South Charleston,
Plaintiffs-Appellees,
v.
PUBLIC SERVICE COMMISSION OF WEST VIRGINIA; Boyce Griffith,
Chairman; Otis D. Casto, Commissioner; Richard
D. Frum, Commissioner, Defendants-Appellants.
 No. 94-2285.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 8, 1995.
Decided June 9, 1995.
 
 ARGUED: Richard Edward Hitt, Charleston, WV, for appellants. James David Kauffelt, Kauffelt & Kauffelt, Charleston, WV, for appellees. ON BRIEF: Cathy Culhane, Charleston, WV, for appellants. T.D. Kauffelt, Kauffelt & Kauffelt, Charleston, WV, for appellees. Carolyn C. Atkinson, City Atty., City of South Charleston, South Charleston, WV, for appellees.
 Before HALL and DIANA GRIBBON MOTZ, Circuit Judges, and WILLIAMS, United States District Judge for the District of Maryland, sitting by designation.
 Reversed and remanded by published opinion. Judge DIANA GRIBBON MOTZ wrote the opinion, in which Judge HALL and Judge WILLIAMS joined.
 OPINION
 DIANA GRIBBON MOTZ, Circuit Judge:
 
 
 1
 The district court held that a 1990 West Virginia statute and related orders of the state's Public Service Commission (PSC) impaired contractual obligations contained in sewer bond contracts between two West Virginia cities and their bondholders in violation of the Contract Clause of the United States Constitution,[1] and so granted summary judgment to the cities. Because the statute and orders do not constitute a substantial impairment of any contractual right, we reverse and remand.
 
 I.
 
 2
 The West Virginia Legislature has allotted certain authority for the operation of sewer systems to municipalities, see W.Va.Code Sec. 16-13-1 et seq., and certain authority for their operation to the PSC. See W.Va.Code Sec. 24-1-1 et seq. The boundaries of the division of that authority have long been a point of contention. See, e.g., City of Benwood v. Public Service Comm'n, 75 W.Va. 127, 83 S.E. 295 (1914). There is no dispute, however, that the cities of Charleston and South Charleston (collectively, the cities) have the authority to issue sewer revenue bonds. See W.Va.Code. Sec. 16-13-16. Conversely, the cities acknowledge that because they own and operate sewage collection and treatment systems that are public utilities, they are subject to the jurisdiction of the PSC and that the PSC is "empowered by Chapter 24 of the West Virginia Code to regulate the rates, charges, practices and procedures of public utilities."
 
 
 3
 The present controversy arises from five separate bond series issued by the cities and the contractual obligations contained in the respective bond contracts. Charleston has two outstanding sewer revenue bond issues relevant to this action, both issued in 1989. South Charleston has three relevant outstanding bond issues, issued in 1956, 1961, and 1986, respectively. The bond contracts provide that all rates and charges, if not paid when due, shall be "a lien on the premises served."
 
 
 4
 Each of the bonds was issued pursuant to a separate bond ordinance. Both Charleston bond ordinances and the 1986 South Charleston bond ordinance provide:
 
 
 5
 The City will ... take all steps, actions, and proceedings for the enforcement and collection of such fees ... to the full extent permitted or authorized by the laws of the State, and the rules and regulations of the PSC. All such rates and charges, if not paid when due, shall become a lien on the premises served by the System.
 
 
 6
 The City further covenants and agrees that it will, to the full extent permitted by law, and the rules and regulations promulgated by the PSC, discontinue and shut off the services and facilities of the System....
 
 
 7
 These ordinances further state that they "shall be deemed to be and shall constitute a contract between the city and such Registered Owners," that the relevant bond "is authorized and issued under and in full compliance with the Constitution and the statutes of the State of West Virginia, including particularly Article 13 of Chapter 16 of the Code of West Virginia," and that "[a]ll such covenants, agreements and provisions shall be irrevocable, except as provided herein, as long as any of the Bonds or the interest thereon is Outstanding and unpaid." Although the entire text of the bond ordinances and bond contracts is not included in the record, the portions that are included indicate (and the parties do not assert to the contrary) that the remaining two South Charleston bond ordinances and contracts contain similar, although not identical, language.
 
 
 8
 In addition, the cities maintain that Sec. 16-13-16 of the West Virginia Code "form[ed] a part of these contracts between the Cities and their bondholders, as if written verbatim into the bonds themselves." That statute requires, inter alia, that a municipality issuing sewer revenue bonds establish rates "to be paid by the owner" and that those charges "if not paid when due shall constitute a lien upon the premises served." W.Va.Code Sec. 16-13-16. The cities contend that the bond issues "constitute binding contractual obligations to the various purchasers of the bonds" that the cities will use the remedies outlined in the state and local legislation, including the power to impose liens, to collect from delinquent users and so protect the investments of the bond purchasers relating thereto.
 
 
 9
 In 1989, the West Virginia Legislature amended Sec. 8-18-23 of the West Virginia Code to allow sewer utilities, like the cities, to require utilities providing water service to terminate that service to a user who has failed to pay sewer bills. The statute further provided that "the owner, user, and property shall be held liable at law until such time as all such [sewer] rates and charges are fully paid." A year later, the Legislature again amended Sec. 8-18-23 to provide:
 
 
 10
 [A]n owner of real property may not be held liable for the delinquent rates or charges for services or facilities of a tenant, nor shall any lien attach to real property for the reason of delinquent rates or charges for services or facilities of a tenant of such real property unless the owner has contracted directly with the municipality to purchase such services or facilities.
 
 
 11
 (Emphasis added). In other words, after 1990, an owner could not be held personally liable and a lien could not be placed on his property to recover sewer charges owed by delinquent former tenants.
 
 
 12
 Thus, in the original bond contracts, the cities were empowered, "to the extent permitted" by "the laws of the state and rules and regulations of the PSC," to collect delinquent sewer charges by imposing a lien on "premises served," including those that were leased, even if only the tenant (and not the landlord) was delinquent. However, in the bond contracts, the cities were not empowered to insist that water service provided by a utility other than themselves be shut off if a user was delinquent in paying its sewer bill to the cities. The effect of the 1989 amendment to Sec. 8-18-23 was to grant cities this additional remedy--the right to insist upon the termination of water service to any delinquent sewer user. The effect of the 1990 amendment was to remove the lien remedy as to rental property, i.e., no liens could be placed on an owner's property because a tenant failed to pay a bill.
 
 
 13
 In March, 1992, the PSC issued two orders ruling that Charleston could not require the termination of water service to landlords because their previous tenants failed to pay sewer charges. See Copley v. Charleston Sanitary Board, PSC Case No. 90-518-S-C; Moore, et al. v. Charleston Sanitary Board, PSC Case No. 90-120-S-C, et al. The PSC reasoned that Sec. 8-18-23, as amended, allowed termination of water service to delinquent sewer service users, but did not permit termination of water service to a rental property because prior tenants had not paid for sewer service.
 
 
 14
 In February, 1993, the cities initiated this action against the PSC and its individual members (collectively, the PSC), asserting that the 1990 amendment and the PSC's orders violated their rights under the Contract Clause. Accordingly, the cities asked the district court to declare that the 1990 amendment and the PSC orders constituted an unconstitutional "impairment of the contracts between the Cities and their sewer revenue bond holders." The district court granted summary judgment to the cities, finding that the amended statute constituted a "substantial impairment of the contractual relationship" between the cities and their bondholders, which was not justified by any "significant and legitimate public purpose."
 
 II.
 
 15
 Initially, we consider the standing of the cities to make the claims pursued here. The cities assert that as a result of the 1990 amendment and the PSC's orders they "are suffering increasing delinquent accounts .... [which] directly and adversely affect the good financial condition of the cities' sanitary funds" and that "the contractual right granted" to the bond purchasers, which the cities "are contractually bound to protect and vindicate," is "directly and substantially impaired."
 
 
 16
 Very early in our history, the Supreme Court held that a municipal corporation cannot assert that its "creator" state has violated the Contract Clause by impairing a contract between the municipal corporation and the state which involves governmental powers and functions. See, e.g., City of Covington v. Kentucky, 173 U.S. 231, 19 S.Ct. 383, 43 L.Ed. 679 (1899); Williamson v. New Jersey, 130 U.S. 189, 9 S.Ct. 453, 32 L.Ed. 915 (1889); County Court of Cape Girardeau County v. United States, 118 U.S. 68, 6 S.Ct. 951, 30 L.Ed. 73 (1886); Town of East Hartford v. Hartford Bridge Co., 51 U.S. (10 How.) 511, 13 L.Ed. 518 (1850); Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 4 L.Ed. 629 (1819).
 
 
 17
 In other cases, however, the Court suggested that if a city is performing a "private and proprietary," rather than "public and governmental," function, it might be able to invoke the Contract Clause against its parent state. See, e.g., City of Worcester v. Worcester Consol. St. Ry., 196 U.S. 539, 551, 25 S.Ct. 327, 330, 49 L.Ed. 591 (1905); Hunter v. City of Pittsburgh, 207 U.S. 161, 179-80, 28 S.Ct. 40, 47, 52 L.Ed. 151 (1907). But see City of Covington, 173 U.S. at 238, 19 S.Ct. at 386 (even assuming that city is performing a private function, the Contract Clause afforded it no protection).
 
 
 18
 The Court soundly rejected this distinction in City of Trenton v. New Jersey, 262 U.S. 182, 188, 43 S.Ct. 534, 537, 67 L.Ed. 937 (1923). In City of Trenton, the state had granted a private waterworks company the right to take, without any fee, all necessary water from the Delaware River. After the city purchased the waterworks company, the state legislature enacted a statute requiring that every municipality pay a fee for water, in excess of a certain amount, taken from the river. The Supreme Court acknowledged that in prior cases it had suggested a possible distinction between contracts involving property owned by cities in their governmental capacity and those involving property owned by them in their proprietary capacity, but pointed out that in none of those cases was any right of a city held to be protected by the Contract Clause. The Court then dismissed the case before it for lack of jurisdiction, reasoning:
 
 
 19
 [S]uch distinction [between governmental and proprietary functions] furnishes no ground for the application of constitutional restraints here sought to be invoked by the City of Trenton against the State of New Jersey. They do not apply as against the State in favor of its own municipalities. We hold that the City cannot invoke these provisions of the Federal Constitution against the imposition of the license fee or charge for diversion of water specified in the state law here in question....
 
 
 20
 262 U.S. at 191-92, 43 S.Ct. at 538; see also Risty v. Chicago R.I. & P. Ry. Co., 270 U.S. 378, 390, 46 S.Ct. 236, 241, 70 L.Ed. 641 (1926). Thus, it now seems settled, absent clear state law to the contrary,[2] that a city cannot assert that its creator state has violated the Contract Clause by impairing a contract between the city and the state itself. See, e.g., Appling County v. Municipal Elec. Authority, 621 F.2d 1301, 1308 (5th Cir.), cert. denied, 449 U.S. 1015, 101 S.Ct. 574, 66 L.Ed.2d 474 (1980); Town of Charlestown, R.I. v. United States, 696 F.Supp. 800, 806-07 (D.R.I.1988), aff'd, 873 F.2d 1433 (1st Cir.1989).
 
 
 21
 There is also some support for the conclusion that a municipality has no standing to bring any suit based on the Contract Clause (or any other part of the Constitution) against the state that created it. In Williams v. Mayor & City Council of Baltimore, 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015 (1933), the Court expansively asserted:
 
 
 22
 A municipal corporation, created by a state for the better ordering of government, has no privileges and immunities under the Federal Constitution which it may invoke in opposition to the will of its creator.
 
 
 23
 (Emphasis added). Williams has been followed largely in Fourteenth Amendment cases. See Town of Ball v. Rapides Parish Police Jury, 746 F.2d 1049, 1051 n. 1 (5th Cir.1984); Village of Arlington Heights v. Regional Transp. Authority, 653 F.2d 1149, 1151-53 (7th Cir.1981); City of South Lake Tahoe v. California Tahoe Regional Planning Agency, 625 F.2d 231, 233-34 (9th Cir.), cert. denied, 449 U.S. 1039, 101 S.Ct. 619, 66 L.Ed.2d 502 (1980); City of New York v. Richardson, 473 F.2d 923, 929 (2d Cir.), cert. denied, 412 U.S. 950, 93 S.Ct. 3012, 37 L.Ed.2d 1002 (1973); see also Paul M. Bator et al., Hart & Wechsler's The Federal Courts and the Federal System 182 (2d ed. 1973) ("Municipal corporations have regularly been denied standing in the federal courts to attack state legislation as violative of the federal Constitution, on the ground that they have no rights against the state of which they are a creature."). But, in Coleman v. Miller, the Court expressly indicated that this principle was also applicable in the context of a Contract Clause claim:
 
 
 24
 Being but creatures of the State, municipal corporations have no standing to invoke the contract clause or the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator.
 
 
 25
 307 U.S. 433, 441, 59 S.Ct. 972, 976, 83 L.Ed. 1385 (1939) (emphasis added) (dictum).
 
 
 26
 The Coleman statement was, however, only dictum, and we have been unable to find a single federal case holding that a city cannot sue its parent state for impairing a contract between the city and a third party,[3] let alone one so holding when the city has a contractual obligation to protect the third party's rights under the contract.[4] Furthermore, in suits by creditors of a city or town, it has long been recognized that even though a municipality is just a creature of the state, a state cannot, consistent with the Contract Clause, abolish the municipality without preserving to its creditors some effective means to collect the debts owed to them. See Graham v. Folsom, 200 U.S. 248, 253-54, 26 S.Ct. 245, 247, 50 L.Ed. 464 (1906); Town of Mount Pleasant v. Beckwith, 100 U.S. 514, 25 L.Ed. 699 (1879).
 
 
 27
 Moreover, doubts have been expressed as to whether the "broad dicta" that "a political subdivision may never sue its maker on constitutional grounds" is really "the rule." See San Diego Unified Port Dist. v. Gianturco, 651 F.2d 1306, 1309 (9th Cir.1981), cert. denied, 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982); see also City of South Lake Tahoe v. California Tahoe Regional Planning Agency, 449 U.S. 1039, 1042, 101 S.Ct. 619, 621, 66 L.Ed.2d 502 (1980) (White & Marshall, JJ., dissenting from denial of certiorari) ("Such a per se rule is inconsistent with [Board of Educ. v.] Allen [, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) ]"); Gomillion v. Lightfoot, 364 U.S. 339, 344-45, 81 S.Ct. 125, 129, 5 L.Ed.2d 110 (1960); United States v. Alabama, 791 F.2d 1450, 1455 (11th Cir.1986), cert. denied, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144 (1987); South Macomb Disposal Authority v. Township of Washington, 790 F.2d 500, 504-06 (6th Cir.1986); Rogers v. Brockette, 588 F.2d 1057, 1067-71 (5th Cir.), cert. denied, 444 U.S. 827, 100 S.Ct. 52, 62 L.Ed.2d 35 (1979).
 
 
 28
 Thus, whether the cities have standing to bring this suit is unclear. In this case we need not resolve this troublesome question because even if the cities have standing to maintain this action, their claim clearly fails on the merits.[5] Accordingly, we assume--without deciding--that the cities have standing to assert the Contract Clause claim made here and address the merits of that claim.
 
 III.
 
 29
 The Contract Clause mandates: "No state shall ... pass ... any ... Law impairing the Obligation of Contracts...." U.S. Const. Art. I, Sec. 10, cl. 1. The Supreme Court, however, has long held that this seemingly absolute prohibition is not absolute at all. See, e.g., Energy Reserves Group v. Kansas Power & Light Co., 459 U.S. 400, 410, 103 S.Ct. 697, 703-04, 74 L.Ed.2d 569 (1983); Allied Structural Steel v. Spannaus, 438 U.S. 234, 240, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978); United States Trust Co. v. New Jersey, 431 U.S. 1, 21, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977); Home Bldg. & Loan Ass'n. v. Blaisdell, 290 U.S. 398, 434, 54 S.Ct. 231, 238, 78 L.Ed. 413 (1934).
 
 
 30
 Instead, the Court has developed a "three-part analysis for harmonizing the command of the Clause with" those powers " 'necessarily reserved' " to the states "to provide for the welfare of their citizens." Baltimore Teachers Union v. Mayor and City Council of Baltimore, 6 F.3d 1012, 1015 (4th Cir.1993) (quoting United States Trust, 431 U.S. at 21, 97 S.Ct. at 1517), cert. denied, --- U.S. ---, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994). Initially, a court must determine whether state law has, in fact, impaired any contract; if so, it must then determine if the contract was "substantially impaired;" if the state law is found to constitute a substantial impairment of the contract, a court must determine "whether that impairment is nonetheless permissible as a legitimate exercise of the state's sovereign powers."[6] Id.; Spannaus, 438 U.S. at 244, 98 S.Ct. at 2722; United States Trust, 431 U.S. at 17, 97 S.Ct. at 1515. Only if there is a contract, which has been substantially impaired, and there is no legitimate public purpose justifying the impairment, is there a violation of the Contract Clause.
 
 A.
 
 31
 In the present case, the district court gave no consideration to the threshold inquiry of "whether there is a contractual relationship, [and] whether a change in law impairs that contractual relationship...." General Motors v. Romein, 503 U.S. 181, 186, 112 S.Ct. 1105, 1109, 117 L.Ed.2d 328 (1992). It is worth some analysis. Although the cities clearly entered into bond contracts with their bondholders, the nature and extent of those contracts and whether they were impaired by the 1990 amendment are not at all clear.
 
 
 32
 At the time the bonds were issued, the Legislature authorized the cities "to issue revenue bonds," W.Va.Code Sec. 16-13-1; "to make and enter into all contracts and agreements necessary or incidental to the performance of [their] duties and the execution of [their] powers under this article," W.Va.Code Sec. 16-13-3; and to establish rates to "be paid by the owner," which "if not paid when due [would] constitute a lien upon the premises served." W.Va.Code Sec. 16-13-16.[7] The cities entered into bond contracts covenanting to "diligently enforce and collect all fees." Those contracts provide that charges "not paid when due shall become a lien on the premises." On the other hand, the cities covenanted only to enforce and collect charges "to the full extent permitted or authorized by the laws of the State, and the rules and regulations of the PSC."
 
 
 33
 In a somewhat similar case, the West Virginia Supreme Court of Appeals, after examining the city's charter, rejected the city's contention that rate increases ordered by the PSC impaired "binding contracts" between the city and the private water company "regulating" the water company's "charges or activities" in violation of the Contract Clause because no "portion of the charter clear[ly] grant[ed] ... [the city] authority" to enter into such "binding contracts." City of Charleston, 103 S.E. at 674-75 (citations omitted). The court explained:
 
 
 34
 [T]he authority of the municipality so to restrict and limit the power of the state "must clearly and unmistakably appear, and all doubts must be resolved in favor of the continuance of the power." The intent to confer upon a municipality the power to make an inviolable contract of this nature cannot be implied.
 
 
 35
 Id.; see also City of Benwood, 83 S.E. at 297-98. Moreover, under West Virginia law:
 
 
 36
 [A]ll contracts made by a utility relating to the public service must be deemed to be entered into in contemplation of the exercise by the state of its regulatory power whenever the public interest may make it necessary ... although an otherwise valid contract is binding on the parties to it until a departure from such contract has been directed by competent authority.
 
 
 37
 Preston County Light & Power Co. v. Renick, 145 W.Va. 115, 113 S.E.2d 378, 387 (1960); see also United Fuel Gas Co. v. Battle, 153 W.Va. 222, 167 S.E.2d 890, 904 , cert. denied, 396 U.S. 116, 90 S.Ct. 398, 24 L.Ed.2d 309 (1969).
 
 
 38
 In view of the rigorous standards developed by the West Virginia courts and the fact that the bond contracts expressly state that the cities' enforcement authority is limited to that "authorized by the laws of the state, and the rules and regulations of the PSC," it well may be that the bond contracts at issue here were not impaired at all. As Justice Holmes noted: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." Hudson County Water Co. v. McCarter, 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908); see also United States Trust, 431 U.S. at 22, 97 S.Ct. at 1517; Bannum, Inc. v. Town of Ashland, 922 F.2d 197, 202-03 (4th Cir.1990).
 
 B.
 
 39
 Even if the bond contracts were impaired by the 1990 amendment, however, there would be no Contract Clause violation unless that impairment was substantial. The district court concluded that there had "indeed been a substantial impairment" because:
 
 
 40
 Although the plaintiffs are able to meet their bond obligations at present,[8] they may not be able to do so in the future. Thus, whether the plaintiffs are able to pay bondholders is not the critical issue here. The plaintiffs had explicit contractual agreements with their bondholders to place liens on "premises served" when bills are not paid. The statutory amendment obliterating this agreement is a substantial impairment of it.
 
 
 41
 This summary analysis may be due to the fact that, as we noted in Baltimore Teachers Union, the "Supreme Court has provided little specific guidance as to what constitutes a 'substantial' contract impairment." 6 F.3d at 1017. "Total destruction of contractual expectations is not necessary for a finding of substantial impairment." Energy Reserves, 459 U.S. at 411, 103 S.Ct. at 704. It is established, however, that a finding of "technical impairment" is insufficient, i.e., such a finding is merely "a preliminary step in resolving the more difficult question of whether that impairment is permitted under the Constitution." United States Trust, 431 U.S. at 21, 97 S.Ct. at 1517.
 
 
 42
 In determining whether an impairment is substantial and so not "permitted under the Constitution," of greatest concern appears to be the contracting parties' actual reliance on the abridged contractual term. Specifically, the Supreme Court has examined contracts to determine whether the abridged right is one that was "reasonably relied" on by the complaining party, Spannaus, 438 U.S. at 246, 98 S.Ct. at 2723, or one that "substantially induced" that party "to enter into the contract." City of El Paso v. Simmons, 379 U.S. 497, 514, 85 S.Ct. 577, 587, 13 L.Ed.2d 446 (1965); see also United States Trust, 431 U.S. at 19 n. 17, 97 S.Ct. at 1516 n. 17. See generally Baltimore Teachers Union, 6 F.3d at 1017-18 and n. 7. When assessing whether there has been the requisite reliance, the Court has looked to objective evidence of reliance.[9]
 
 
 43
 For example, the Court has examined the terms of the original contract to determine whether the contract--either explicitly or implicitly--indicated that the abridged term was subject to impairment by the legislature. See Richmond Mortgage & Loan Corp. v. Wachovia Bank & Trust Co., 300 U.S. 124, 130 n. 5, 57 S.Ct. 338, 340 n. 5, 81 L.Ed. 552 (1937). Here, as noted above, the cities covenanted to collect charges for sewer service "to the full extent permitted or authorized by the laws and the State, and the rules and regulations of the PSC " (emphasis added). Accordingly, in the bond contracts it was expressly acknowledged that the cities' obligations to collect sewer charges and the bondholders' rights to have the cities collect these charges were subject to legislative authorization and regulation.
 
 
 44
 The Supreme Court has also directed that in assessing the parties' expectations, and so "determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past." Energy Reserves, 459 U.S. at 411, 103 S.Ct. at 704; Spannaus, 438 U.S. at 242 n. 13, 98 S.Ct. at 2721 n. 13. "[P]ervasiveness of ... prior regulation ... suggests that absent some affirmative indication to the contrary the [complaining party] had no legitimate expectation that regulation would cease...." National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 469, 105 S.Ct. 1441, 1453, 84 L.Ed.2d 432 (1985). The authority of the PSC to regulate the rates and practices of West Virginia municipalities, when acting as utilities, has existed at least since 1914. See City of Benwood, 83 S.E. at 296. The specific power of the PSC to regulate the extension, Renick, 116 S.E.2d at 770, and termination, Chesapeake & Potomac Tel. Co. v. City of Morgantown, 144 W.Va. 149, 107 S.E.2d 489, 497 (1959), of service by a public utility to its customers is also well established. Thus, PSC regulation was "pervasive" and there was no reason for the cities and their bondholders to believe regulation would cease.[10]
 
 
 45
 The Court has also examined how a contract has been changed, i.e., whether a covenant was abolished or "merely modified." United States Trust, 431 U.S. at 19, 97 S.Ct. at 1516. In United States Trust, an amendment to state law "totally eliminated" the state's prior promise that Port Authority revenues would be pledged to pay bondholders and, except for specified instances, not applied to future deficits of railway facilities, and so was found to constitute a substantial impairment. Id. The Court noted, however, that "a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement." Id. at 19 n. 17, 97 S.Ct. at 1516 n. 17. The 1990 amendment to Sec. 8-18-23 only modifies the cities' right to impose liens on premises served, limiting that right to premises owned by the actual delinquent owners. The undisputed evidence before the district court on summary judgment was that the majority of sewer accounts in both cities involved owner-occupied premises (84% in South Charleston and 65% in Charleston). The challenged 1990 amendment would, of course, have no effect on collection efforts with regard to these accounts.
 
 
 46
 Finally, in determining the parties' reliance, the cases have focused on the character of the abridged right--whether it was by its nature "the central undertaking" or "primary consideration" of the parties. City of El Paso, 379 U.S. at 514, 85 S.Ct. at 586. Thus, elimination of escalator clauses in natural gas contracts, Energy Reserves, 459 U.S. at 415-16, 103 S.Ct. at 706-07; lowering the interest rate and delaying the maturity date in bond contracts, Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502, 504, 62 S.Ct. 1129, 1130-31, 86 L.Ed. 1629 (1942); and elimination of the unlimited right to reinstate ownership of land after default, City of El Paso, 379 U.S. at 515, 85 S.Ct. at 587, have been held not to constitute substantial impairments of contract rights, in part because the rights abridged were not in their nature essential to the underlying contract. In contrast, statutes causing "a fundamental change" in a pension contract, Spannaus, 438 U.S. at 246, 98 S.Ct. at 2723; repealing a statutory covenant, the purpose of which "was to invoke the constitutional protection of the Contract Clause as security against repeal," United States Trust, 431 U.S. at 18, 97 S.Ct. at 1515-16; and unilaterally modifying a contract right upon which the parties "especially" relied, i.e., "the right to compensation at the contractually specified level" in a public employment contract, Baltimore Teachers Union, 6 F.3d at 1018, have been held substantial impairments because the rights impaired by subsequent legislation were "important," U.S. Trust, 431 U.S. at 19, 97 S.Ct. at 1516, "basic," Spannaus, 438 U.S. at 246, 98 S.Ct. at 2723, and "central," Baltimore Teachers Union, 6 F.3d at 1018, to the underlying contract. The modification of the bond contracts here so that one remedy--the right to impose liens--was removed as to one relatively small group simply does not constitute a right similarly "important," "basic," or "central." Like the Court in City of El Paso, "[w]e do not believe it can seriously be contended that the [bondholders were] substantially induced to enter these contracts" on the basis of the right abridged by subsequent legislative amendment. City of El Paso, 379 U.S. at 514, 85 S.Ct. at 587.
 
 
 47
 To recapitulate, in determining the parties' expectations and actual reliance on the abridged contractual term, the Supreme Court has looked to several objective factors. Here each of these factors indicate that the 1990 amendment did not constitute a substantial impairment of the bond contracts. The bond contracts themselves contain express acknowledgements that the parties' rights were subject to legislative regulation; there was a long established precedent of extensive state regulation of public utilities; the contracts were not abolished but merely modified; and the abridged right is, by its nature, not one central to the parties' undertaking.
 
 
 48
 Moreover, there is one further indication that the alleged impairment was not substantial. In addition to assessing the parties' expectations and actual reliance on the abridged contractual term, the Supreme Court has also directed that, in determining whether there has been a substantial impairment, a court should determine whether the abridged right was "replaced by an arguably comparable security provision." United States Trust, 431 U.S. at 19, 97 S.Ct. at 1516. This is so because "[t]he particular remedy existing at the date of contract may be altogether abrogated if another equally effective for the enforcement of the obligations remains or is substituted for the one taken away." Richmond Mortgage & Loan Corp., 300 U.S. at 128-29, 57 S.Ct. at 339. "The parties may rely on the continued existence of adequate statutory remedies for enforcing their agreement, but they are unlikely to expect that state law will remain entirely static." United States Trust, 431 U.S. at 19 n. 17, 97 S.Ct. at 1516 n. 17. In United States Trust, upon which the cities so heavily rely, no substitute security--of any kind--had been afforded the bondholders.
 
 
 49
 In contrast, the PSC argues that in this case "the Legislature in 1989, provided the utilities with a far more effective remedy to insure the payment of sewer bills by providing that customers' water service can be terminated for failure to pay such bills," and that the district court erred in failing to "consider the impact of the substituted remedy." In support of this claim, the PSC submitted uncontroverted evidence that after enactment of the 1989 amendment permitting the cities to require termination of water service to those with delinquent sewer bills, Charleston's revenues from sewer service increased 4.7% and its accounts receivable decreased 44.7%, and South Charleston's revenues increased 29.3% and its accounts receivable decreased 4.2%.
 
 
 50
 The cities contend that it was proper for the district court to ignore the effect of this new remedy because "[t]he water service termination provision [w]as enacted in 1989, [and] the elimination of rental property liens was enacted in 1990," and so, they claim, the former cannot be regarded as a replacement for the latter. We cannot agree. The Supreme Court has never suggested that the comparable remedy must be enacted at the same time that the original remedy is modified. The critical date is that on which the contracts were entered into. The cities do not claim that when they entered into the bond contract they had the power to have water service terminated to delinquent sewer bill customers; they now have that power. Thus, although their enforcement power has been modified by the 1990 amendment, the cities have been supplied with another effective security provision in the 1989 amendment. Indeed, there was ample uncontroverted evidence that the 1989 termination provision is a far more effective collection remedy than the lien on rental property that was eliminated in 1990.
 
 IV.
 
 51
 In sum, assuming the cities have standing to pursue their Contract Clause claim, if the bond contracts were impaired at all by the 1990 amendment to W.Va.Code Sec. 8-18-23, that impairment was clearly insubstantial. There was no violation of the Contract Clause.[11] Accordingly, the judgment of the district court is reversed, and the case is remanded for entry of summary judgment in favor of the Public Service Commission of West Virginia.
 
 
 52
 REVERSED AND REMANDED.
 
 
 
 [1]
 The Constitution of the United States provides: "No state shall ... pass any ... Law impairing the Obligation of Contracts...." U.S. Const. Art. 1, Sec. 10, cl. 1. The West Virginia Constitution similarly provides: "No ... law impairing the obligation of a contract shall be passed." W.Va. Const. Art. 3, Sec. 4. The cities rely on both constitutional provisions, and the district court held both were violated. "In construing [its] state constitutional provision[s]," the Supreme Court of Appeals of West Virginia has "generally accepted the United States Supreme Court's interpretation of the similar provision contained ... in the United States Constitution." Shell v. Metropolitan Life Ins. Co., 181 W.Va. 16, 380 S.E.2d 183, 184 sylb. pt. 1. (1989). Accordingly, we treat the federal and state constitutional claims together
 
 
 [2]
 The West Virginia courts have never directly addressed the question of whether a municipality has rights protected by the Contract Clause against subsequent impairment by its creator state. Compare City of Boston v. Jackson, 260 U.S. 309, 316, 43 S.Ct. 129, 132, 67 L.Ed. 274 (1922), and City of Pawhuska v. Pawhuska Oil & Gas Co., 250 U.S. 394, 39 S.Ct. 526, 63 L.Ed. 1054 (1919). In early cases, they did entertain Contract Clause claims brought by municipalities against the State, but in those cases they did not consider the cities' standing to assert such a claim or even hold that there was a Contract Clause violation. See, e.g., City of Charleston v. Public Service Comm'n, 86 W.Va. 536, 103 S.E. 673 (1920); City of Benwood, 83 S.E. at 298
 
 
 [3]
 In fact, St. Cloud Public Service Co. v. City of St. Cloud, 265 U.S. 352, 44 S.Ct. 492, 68 L.Ed. 1050 (1924), and Superior Water, Light & Power Co. v. City of Superior, 263 U.S. 125, 44 S.Ct. 82, 68 L.Ed. 204 (1923), implicitly support the cities' standing in the present case, as do--notwithstanding City of Trenton v. New Jersey-- City of Worcester v. Worcester Consol. St. Ry., 196 U.S. 539, 25 S.Ct. 327, 49 L.Ed. 591 (1905), and City of New Orleans v. New Orleans Water-Works Co., 142 U.S. 79, 12 S.Ct. 142, 35 L.Ed. 943 (1891)
 
 
 [4]
 One of the very few cases in which a city attempted to assert, on behalf of third parties, that the state had impaired a contract between the city and third parties is Hunter v. City of Pittsburgh, 207 U.S. at 179-80, 28 S.Ct. at 47. There the city claimed that a state statute requiring consolidation of two cities impaired an asserted contract between the city and its citizens that they would only be taxed for the obligations of a particular city. The Supreme Court rejected the claim, not because the city lacked standing to bring it, but because the Court held no such contract existed between the city and its citizens
 
 
 [5]
 Standing, of course, is usually a threshold inquiry. However, the Supreme Court has recognized the propriety of avoiding difficult standing questions when, as here, even assuming a party has standing, it "has not made a case" for the relief sought. See Chandler v. Judicial Council of the Tenth Circuit, 398 U.S. 74, 86, 89, 90 S.Ct. 1648, 1654-55, 1656, 26 L.Ed.2d 100 (1970); see also Secretary of Navy v. Avrech, 418 U.S. 676, 678-79, 94 S.Ct. 3039, 3040, 41 L.Ed.2d 1033 (1974); United States v. Augenblick, 393 U.S. 348, 351-52, 89 S.Ct. 528, 531, 21 L.Ed.2d 537 (1969)
 
 
 [6]
 As part of this third step, a court must determine if the impairment is "upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." United States Trust, 431 U.S. at 22, 97 S.Ct. at 1518
 
 
 [7]
 The PSC concluded that cities (like Charleston and South Charleston) which provide only sewer service are not covered by Sec. 16-13-16, which applies to municipalities that provide both water and sewer service. The district court implicitly rejected this interpretation of Sec. 16-13-16. For the purposes of this appeal, we will assume without deciding that the district court was correct and that Sec. 16-13-16 is applicable to the cities. See Delardas v. Morgantown Water Comm'n, 148 W.Va. 776, 137 S.E.2d 426, 431 (1964); State v. Renick, 145 W.Va. 640, 116 S.E.2d 763 (1960)
 
 
 [8]
 There was uncontradicted evidence that both cities maintained balances in their reserve accounts more than sufficient to cover the principal and interest due on the bonds
 
 
 [9]
 This is one of the reasons why the cities' reliance on the affidavit of an officer of a bondholder that his organization "expected to receive, and did in fact receive, the covenants and promises of [the cities] to place and enforce liens for unpaid sewer charges upon all premises served by the cities' sewer systems" is misplaced. The officer's affidavit does not state that his organization actually relied on or was induced by the lien provision in purchasing the bonds, let alone that the provision was central or important to its purchase of the bonds; indeed, the affidavit does not even indicate that the officer has personal knowledge as to his organization's general "expectations."
 
 
 [10]
 In this regard, the cities' assertion that "[t]he PSC has never regulated the terms or enforcement of municipal bond covenants" misconceives the nature of the regulation in the present case. Neither the 1990 amendment nor the PSC's orders applying it are directed to altering the terms or remedies of bond contracts. Instead, they impose a generally applicable state policy, concerning when liens can be placed on properties and when services can be terminated or denied
 
 
 [11]
 In view of our decision as to the Contract Clause claim, we need not reach the PSC's alternative arguments