John B. BOLLECH, et al.

v.

**CHARLES COUNTY, MARYLAND, et al.**

No. CIV. A. DKC2001–0038.

United States District Court, D. Maryland.

Oct. 19, 2001.

Robert H. Freilich, Freilich Leiter and Carlisle, Stephen J. Moore, Law Office, Kansas City, MO, Gerald W. Heller, Linowes and Blocher LLP, Silver Spring, MD, for Plaintiffs.

Roger Lee Fink, County Commissioners of Charles County MD, La Plata, MD, Kurt J. Fischer, Marta D. Harting, Michelle Jeanine Dickinson, Piper Marbury Rudnick and Wolfe LLP, Baltimore, MD, for Defendants.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Presently pending and ready for resolution in this land use case are (1) Defendants' motion for summary judgment on Plaintiffs' claims for unconstitutional impairment of the obligation of contract, for a declaratory judgment that a 1989 Development Agreement between the parties is a valid and binding contract, for the court to enjoin Defendants from enforcing the rezoning of a tract of land, and for breach of contract and (2) Plaintiffs' cross-motion for partial summary judgment on all counts above except breach of contract. A hearing was held and the issues are fully briefed. For reasons that follow, the court will grant Defendants' motion for summary judgment as to all claims and deny Plaintiffs' cross-motion.

## I. Background

This case arises from a dispute between real estate developers John B. Bollech, *et al.* ("Developers") and Charles County, Maryland *et al.* ("County") over the meaning of a 1989 Development Agreement ("the Agreement") governing a proposed residential development on a tract of land known as Potomac Cliffs. Developers assert that the County impaired the obligation of contract in violation of the Contracts' Clause of the United States Constitution and breached the Agreement when it rezoned Potomac Cliffs and reclassified it for a lower level of water and sewage use. This rezoning prevented the development of the 252 residential units contemplated by the Agreement.

The County argues, in contrast, that it did not breach the Agreement or impair the obligation of contract. According to the County, Developers' interpretation of the Agreement would freeze into perpetuity the zoning laws that governed Potomac Cliffs in 1989. Interpreted thus, the County argues, the Agreement would be unenforceable as illegal "contract zoning." Further, it argues that any obligation on the part of the County not to rezone Potomac Cliffs was discharged by Developers' alleged failure to perform their obligations under the Agreement.

Unless otherwise noted, the following facts are uncontroverted.

### A. 1973 and 1977 Agreements

In or about 1968, Suburban Development Corp. and Ingleside, Inc. (collectively "Suburban"), the predecessor developers to Plaintiffs, began developing a 3.36 square mile area of the County know as Cliffton, of which Potomac Cliffs is a part. Paper no. 20–1, at 3, ex. A. Between 1968 and 1974, Suburban recorded final subdivision plats among the County land records subdividing 572 lots based on representa-

tions to the County that those lots would be serviced by public water and sewer systems which Suburban would construct and operate. *Id.* at 4, ex. A. The water and sewer service was to be provided by Potomac Bluffs Utility Company, Inc. ("PBU"), a private corporation owned by Suburban. In order to provide water and sewer service, PBU was required by Maryland law to obtain a franchise from the County Commissioners.

By 1972, a series of disputes occurred between the County and Suburban after questions arose regarding Suburban's failure to construct and operate sewer and water facilities sufficient to serve the recorded subdivisions and as to whether PBU had ever been granted a utility franchise. This dispute was purported to be resolved in an October 3, 1973 Agreement between the Sanitary District, PBU and Suburban under which the Sanitary District, which had jurisdiction over water and sewer issues in the area, agreed to operate water and sewer facilities in the Cliffton area. Paper no. 20–4, ex. 5; Paper no 20–1, at 5, ex. A. Under this agreement, Suburban and PBU agreed to plan and construct facilities necessary to provide water and sewer service to the Cliffton area.

This agreement failed to resolve the dispute. Purportedly, Suburban and PBU never performed the 1973 Agreement. Among other deficiencies, the Sanitary District's engineers reported that the plans submitted by PBU for the sewage plant and related facilities were not adequate or in compliance with Sanitary District regulations. Paper no. 20–4, ex. 6.

Despite the Sanitary District's concerns and Suburban's purported failure to comply with the 1973 Agreement, the Cliffton project went forward. Paper no. 20–4, ex. 14. On March 22, 1976, Suburban and PBU informed the County Commissioners that the 1973 Agreement had "been abrogated" and Suburban would not agree that the Sanitary District had any role in the residential and water permit process. The County Commissioners approved limited development at Cliffton based on the Health Department's statement that 175 homes could adequately be served by existing water and sewer systems and by Suburban's assurances that it would work towards a resolution of remaining problems. Paper no. 20–4, at ¶ 16, ex. 16. Subsequently, Suburban threatened to declare bankruptcy and shut off water and sewer facilities operated by PBU to service Cliffton unless the County took over the facilities.

Another attempt was made to resolve this dispute with an August 24, 1977 agreement between the County, Suburban and PBU. Paper 20–4, ex. 19. Under this agreement, Suburban agreed to dedicate existing facilities to the County and relinquish any franchise PBU may have had. *Id.* at 2. Suburban also agreed to plan and construct water and sewer facilities to serve an approximately 850–acre tract. Id. at 2–3. In return, the County agreed to accept and operate the facilities and to reimburse Suburban for 75% of certain construction costs through connection charges imposed by County. The County assumed operation of the Cliffton water and sewer systems on October 1, 1977 and informed the State Health department that it was necessary to perform construction and repair work to bring the facilities in conformance with state and federal regulations. Paper no. 20–4, ex. 20. Meanwhile, Suburban and PBU failed to finance additions or improvements following the 1977 agreement and Suburban's corporate charter was revoked on February 8, 1980, its lots in the Cliffton subdivision sold at foreclosure.

### B. *1989 Development Agreement*

On September 13, 1989, the County and Developers, successors in interest to Suburban, executed a Development Agreement relating to Potomac Cliffs and an adjacent tract called Newburg Station, owned by a different entity. The stated purpose of the tripartite Agreement was to give further effect to the 1973 and 1977 agreements providing for water and sewage facilities for Potomac Cliffs. Paper no. 21, at 2; Haapala Affidavit, May 18, 2001, at ¶ 33.

The Agreement also gives further effect to a Letter Agreement between the parties dated March 7, 1989. The Letter Agreement was meant to resolve the water and sewer status of the Potomac Cliffs property, temporarily freeze the zoning regulations to allow for the development of 252 residential units on the property, and to approve the timing and phasing of the property for subdivision and development. *Id.*, ex. 4. The Agreement follows up on this Letter Agreement. The Developers and the County have varying interpretations of what the Agreement says and these varying interpretations are at the heart of this dispute.

The County contends that the Development Agreement provides for the staged development of the parcels in return for the property owners' construction of adequate public facilities to serve the development, including the upgrade of the existing sewer plant to Federal and State standards and the construction of sewer and water facilities to service to the new acreage. Paper no 20–1, at 10; Paper no. 20–3, ex. 2. The County, specifically, points to § 3.2(a) of the Agreement which provides for the development of the 252 units in five phases over a six year period commencing in August, 1988 and ending in August, 1994. While the Agreement assigns primary responsibility to the Newburg Tract owners to construct adequate water and sewer facilities, the County contends that Developers have responsibility for expanding existing sewer facilities in the event that the Newburg Tract owners fail to construct new facilities.

The Developers, in contrast, contend that the time period contemplated by the Agreement for undertaking the development is more open-ended and so, they argue, must be the time in which the County is estopped from reclassifying the water and sewage levels. Second, under the Developers' interpretation of the Agreement, the County, not the Developers, has ultimate responsibility for building sufficient water and sewage treatment plants in the event that the Newburg Tract owners fail, as they did, to build new facilities as stipulated in the Agreement. As a result, the Developers argue that the failure of the County to provide water and sewer facilities prevented them from going forward with the development as outlined in the Agreement. Moreover, they contend that the County's delays in granting final plat approval prevented timely development.

### C. *Developers' failure to gain final plat approval following the 1989 Development Agreement*

On June 29, 1989, the Developers filed an application with the County Department of Planning and Zoning for approval of a preliminary plan of subdivision, proposing to divide Potomac Cliffs into 252 residential lots. Paper no. 20–1, at 13; Paper no 20–3, ex. 1. On August 15, 1991, the Planning Commission adopted Findings of Fact and Conclusions of Law in which it approved Developers' preliminary plan subject to a series of conditions meant to ensure the Developers' satisfaction of State and Federal environmental regulations. Paper no. 20–1, at 14, ex. C.

Under the Charles County Subdivision Regulations in effect at the time, final plat approvals had to be obtained within one year from the approval of the preliminary plan or the preliminary plan became void. *Id.* However, the Planning Commission could grant one-year extensions for approval, which it did twice. *Id.*, ex. F, G, H, I. On June 16, 1994, the Developers' engineer requested a third one-year extension, but was granted an extension only until October 1, 1994. At that time, according to the "grandfather" provisions of the County's 1992 Comprehensive Rezoning Ordinance[1], preliminary plats not recorded as final plats in their entirety would be required to comply with that new zoning ordinance. Paper no. 20–1, at 15; Paper no. 20–3, ex. 10. Subsequently, the County twice extended the deadline for final plat approval by administrative order to April 3, 1995. Paper no 20–1, at 15; Paper 20–3, at ¶ 16.

According to the County's Comprehensive Water and Sewer Plan ("CWSP"), water and sewer facilities must be bonded in order to receive an allocation and, under the County's subdivision regulations, final plat approval could not be granted unless there are water and sewer allocations for the proposed subdivision. Paper no. 20–3, ex. 12. On April 3, 1995, the Planning Commission denied the Developers' final plat on alleged grounds that Developers had failed to bond their proposed sewer facility as required by the CWSP and had failed to obtain the State Health Depart-

ment's approval of the final plat. As a result, the Developers were required to submit a new preliminary plan and meet the requirements of the State Economic Development Resource Protection and Planning Act as implemented through the 1992 zoning ordinance. Paper no. 20–3, at ¶ 19, ex. 16.

The County claims that Developers failed to fulfill their obligations with respect to the construction of sewer and water facilities by failing to submit design documents, failing to post a bond for the project, and failing to undertake the necessary repairs, corrections, and expansion of the plant. Furthermore, Developers never repaired or expanded the existing Cliffton plant to serve existing and planned lots. Paper no. 20–1, at 17; Paper no. 20–3, at ¶ 20. As a result, according to the County, the County spent $184,000 in required repairs and improvements to the Cliffton plant and corrected the plant's history of plant discharge violations. *Id.* at ¶ 22. Additionally, the County claims that another $700,000 needs to spent in the near future to extend the plant's outfall line further into the Potomac River merely to meet the existing permit conditions at the plant. *Id.* at ¶ 23.

Developers have a different recounting of events occurring after they reached the Agreement with County. First, Developers claim that the 1992 comprehensive rezoning has no bearing on Potomac Cliffs because the Development Agreement pro-

---

1. The County enacted the 1992 Comprehensive Rezoning Ordinance pursuant to the 1992 Maryland Economic Growth, Resource Protection, and Planning Act ("Growth Act"). That act amended Md.Code Ann., art. 66B, Zoning and Planning (1992), and imposed new requirements on local planning and zoning authorities. It contained provisions requiring local governments to concentrate development in suitable areas to ensure efficient and effective provision of public infrastruc-

ture. As pertinent to the present case, the ordinance adopted the Resource Protection Overlay Zones ("RPZ") intended to protect the natural resources defined as sensitive areas in the Growth Act. Also, the ordinance requires that developers perform certain analyses of roads and water supply as well as obtain a school allocation prior to final plat approval. An approved plan must wait until an allocation is awarded.

scribes future rezonings and because the property's zoning classification was not changed by the 1992 plan. Furthermore, Developers claim that the County's delays in determining and approving sewer plant improvements effectively prohibited final plat approval by the final April 3, 1995 deadline. Specifically, Developers claim that it commissioned George, Miles & Buhr ("GMB") to prepare a study determining the appropriate design for the sewer plant and detailing problems with the existing plant. Haapala Affidavit, May 18, 2001, at ¶ 58, ex. 13. Developers claim that this report, published in October 1994, included five proposed solutions to which the County did not respond until February 1, 1995. At that time, according to Developers, the County instructed Developers to proceed with "Alternative 1" contained within the GMB report. *Id.* at ¶ 59, ex. 14. Before Developers could act, they claim, the County denied the final subdivision plat on April 3, 1995.

Developers appealed the Planning Commission denial of their final plat to the Board of Appeals. Paper no. 19, ex. B, L, M. Developers argued on appeal that the Planning Commission's denial of the final plat on grounds that the sewer plant had not been bonded as required by the CWSP was in error because the bonding requirement conflicted with § 4.2.5(d) of the Development Agreement. According to Developers, that section of the Agreement, which permitted developers to post bond 30 days after final plat approval, took precedence over the CWSP. The Board of Appeals upheld the decision of the Planning Board, finding that it was not arbitrary and capricious for the Planning Board to deny final plat approval based on Developers failure to bond the sewer plant and obtain a forest conservation easement. Paper no. 20–1, ex. N.

Developers then appealed to the Circuit Court for Charles County. The Circuit Court affirmed the decision of the Board of Appeals, holding specifically that the Agreement does not preempt the requirements of the CWSP even if those requirements conflict. Instead, the Agreement "encourages the parties to 'meet and confer in good faith in a reasonable attempt to modify the agreement to comply with [the new] regulation.'" Paper no. 20–1, ex. O, at 3, *quoting* Agreement, § 5.2.1. In arriving at this holding, the Circuit Court noted that the Agreement gave primary responsibility to Developers for expanding the sewage plant. Paper no. 20–1, ex. O, at 1. Second, the Circuit Court denied Developers' claim that the County's delayed response to their sewage study prevented them from bonding the plant in a timely fashion. The Circuit Court noted that Developers had five years to conduct a study and design a site plan and had already received 2 extensions from the Planning Commission. Paper no. 20–1, ex. O, at 3, 4. Finally, the Circuit Court denied Developers' request to reverse the Board's decision and allow them to proceed with sewage plant construction while conditioning final plat approval on full compliance with State and Federal regulations. *Id.* at 4.

### D. *New zoning regulations and water and sewer classification*

The County has enacted three land use provisions since 1997 which Developers claim impair the Agreement. In 1997, Maryland enacted the "Smart Growth Areas Law" which set priorities for State spending on growth-related projects so as to preserve neighborhoods and environmental resources. Paper 20–3, at ¶ 30. This law directs the establishment of Priority Funding Areas by local governments and mandates that, with certain exceptions, beginning October 1, 1998, the State may not provide funding for a growth-related pro-

ject not located within a Priority Funding Area ("PFA"). Paper no. 20–1, at 21, *citing* State Fin. & Proc., § 5–7B–04. Potomac Cliffs tract was not included in a PFA. Paper no. 20–1, at 21.

Directed at least in part by the Smart Growth Areas Law, the County put out a new Comprehensive Plan in 1997 that designated a Development District of approximately 53,000 acres that generally coincides with the sewer service area of the Mattawoman Wastewater Treatment Plant. This District was intended to be a long-term situs for future intense development. Paper no. 20–3, at ¶ 35. The Comprehensive Plan recommended the removal of the Town Center designation for areas around the Clifton subdivision that had allowed for a higher level of residential density. Instead, the Comprehensive Plan determined that the Village of Newburg could serve local needs while major growth should be concentrated in the Development District and the County's incorporated towns of Indian Head and La Plata. Accordingly, the plan proposed that the area around the Clifton subdivision be rezoned from RL and RM to RC, a designation permitting less residential density. *Id.* at ¶ 37. On December 11, 2000, after public notice, comment, hearings and public work sessions, the County adopted the Comprehensive Rezoning and rezoned Potomac Cliffs from R–M to R–C, effective January 1, 2001. This designation permits a maximum of 43 residential units. Paper 20–3, at ¶¶ 41–43.

Also in an attempt to comply with the Smart Growth Areas Act, the County amended its CWSP[2] in 1998. Among these amendments, the County changed the water and sewer designation for Potomac Cliffs from a W–3/S–3 to W–6/S–6, the new designation indicating that there is no water and sewer service planned for the community. The County adopted this new designation because Potomac Cliffs is far from the Development District, development efforts had been unsuccessful and ineffective in the past, and the area was not included in a PFA. The MDE approved this amendment to the CWSP. Paper no. 20–1, at 23, 24; Paper no 20–3, at ¶ 39.

## II. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *see also Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987); *Morrison v. Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir.1979); *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir.1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); *Pulliam Inv. Co.,* 810 F.2d at 1286 (citing *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to

---

**2.** Md.Code Ann., Envir. § 9–503 (1994), requires each county to adopt and maintain a CWSP which must be approved by the Maryland Department of the Environment ("MDE") and must cover at least a ten-year period following its adoption.

the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir.1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. In *Celotex Corp.*, the Supreme Court stated:

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. However, " 'a mere scintilla of evidence is not enough to create a fact issue.' " *Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir.1984) (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C.1966), *aff'd*, 388 F.2d 987 (4th Cir.1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely col-orable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## III. Analysis

Developers bring claims against the County for unconstitutional impairment of the right to contract, for a declaratory judgment that the Agreement is a valid and binding contract, for the court to enjoin the County from enforcing the rezoning of Potomac Cliffs, and for breach of contract. While both parties briefed issues pertinent to these individual claims extensively, all of the claims depend on the existence an enforceable contract in 1997, when the County began rezoning Potomac Cliffs so as to reduce the number of residential units that could be built on it. The enforceability of the contract is the lynchpin of this case. If the Agreement was not enforceable against the County in 1997, then the County will prevail on all claims.

The County raises two defenses to the enforceability of the Agreement. First, it asserts that if the Agreement is interpreted as Developers would have it, it would freeze zoning of Potomac Cliffs into perpetuity, and so constitute illegal contract zoning. Second, the County claims that Developers' non-performance of its obligations under the Agreement constituted a material failure to perform and so terminated the County's obligation under the Agreement.

### A. *Illegal contract zoning*

■ The County has argued much of this case from the standpoint that the Agreement is unenforceable against it as illegal contract zoning. If interpreted as freezing the zoning into perpetuity, the County argues, it is illegal because it would bargain away the police power. As will be seen, the court does not, ultimately,

have to decide whether the Agreement is illegal contract zoning. However, looking at the Agreement under the rubric of contract zoning analysis is useful for demonstrating how the Agreement operated.

 Under Maryland law, contract zoning is illegal when, "a local government enters into an agreement with a developer whereby the government exacts a performance or promise from the developer in exchange for its agreement to rezone the property..." *People's Counsel for Baltimore County v. Beachwood I Limited Partnership*, 107 Md.App. 627, 629, 670 A.2d 484 (1995), *cert. denied*, 342 Md. 472, 677 A.2d 565 (1996), *quoting* Arden H. Rathkopf and Daren A. Rathkopf, 2 THE LAW OF ZONING AND PLANNING, § 29A.03[b] at 29A–25. One of the difficulties in this area is that "contract zoning" is only vaguely defined in case law and academic commentary. There is no bright line rule. In *Beachwood*, 107 Md.App. at 668–69, 670 A.2d 484, the Maryland court explained:

> The Maryland cases have treated "contract zoning" narrowly as a situation wherein the developer of property enters into an express and legally binding contract with the ultimate zoning authority. In such circumstances, the Maryland cases have not hesitated to hold such contract zoning to be null and void. Part of the reason why the governmental authority may not enter into such a contract is because the governmental unit may not bargain away its future use of the police power.

Contract zoning was actually a non-issue in *Beachwood* as the alleged conduct in question involved two separate government agencies, one making the contract and the other regulating zoning. To find such conduct illegal would require a "ban on contract zoning far broader in its sweep" than the existing ban. *Id.* at 674–75, 670 A.2d 484. Illegal contract zoning is limited to a *quid pro quo* between the developers and a single zoning authority. *Id.* at 675, 670 A.2d 484.

According to Rathkopf, 29A.03 at 29A–33,34, courts generally have held that rezoning agreements that protect land from future rezonings are void as "illegal contract zoning" because those agreements bargain away the state's police powers. However, this prohibition is not absolute. In *Brandywine Enterprises v. County Council for Prince George's County*, 117 Md.App. 525, 700 A.2d 1216 (1997), the court found that the placement of conditions upon a special exception use did not constitute illegal contract zoning because it was "an appropriate exercise of, rather than an abdication of, a local government's police powers." *Brandywine*, 117 Md. App. at 536–37, 700 A.2d 1216, *citing Mossburg v. Montgomery County*, 107 Md. App. 1, 30, 666 A.2d 1253 (1995). Developers contend that the agreement does not promise any new favorable zoning, but rather preserves the zoning and other land use classification in place at the time the Agreement was made. Paper no. 24, at 6. Thus, they try to fit this case into the analysis in *Brandywine*, 117 Md.App. at 537, 700 A.2d 1216, where the court found that an agreement was not contract zoning where it was not an agreement to rezone. However, the key distinction in *Brandywine* is not merely between rezoning and the preservation of existing zoning, as Developers would have it, but rather the extent to which the rezoning reflected an appropriate exercise as opposed to an abdication of the police powers.

The Maryland court also rejected the application of contract zoning in *Mayor and City Council of Baltimore v. Crane*, 277 Md. 198, 352 A.2d 786 (1976), when it sustained a development agreement preserving the development capacity on a parcel of land in exchange for the dedication

of a highway right of way. The court upheld the use of development agreements, stating: "It is the law of this State that a municipality, acting through its duly elected or appointed officials, becomes bound by its agreements so long as those agreements are for the public good." *Crane*, 277 Md. at 210, 352 A.2d 786.

■ *Crane* and *Brandywine* focus the contract zoning analysis on whether the agreement made by the governing authority was for the public good or not. The real test, then, is not whether the County entered into a contract preserving zoning in exchange for promises from Developers, but whether the arrangement it did make is an exercise of or limitation on the government's police powers. Rather than merely a semantic distinction, this test looks to the more general proposition of whether an agreement was made to benefit the general welfare.

■ Under this standard, municipalities generally should be bound by agreements so long as those agreements are for the public good. *See Crane*, 277 Md. at 210, 352 A.2d 786. Development agreements are not illegal contract zoning *ab initio*. Development agreements are defined as "agreements between a municipality and a developer under which site specific conditions may be imposed but the right to develop in compliance therewith is 'vested' at least for a certain period of time." Rathkopf, § 29A.02, 29A–3, 4. Maryland codified the use of development agreements in 1995 when it enacted a Development Rights & Responsibilities Act, codified at Md.Code Ann., art. 66B, § 13.01 (1995). While this act is inapplicable to the Agreement at issue which was made in 1989, the Maryland Code recognized that such agreements were legal prior to the act's passage.[3]

While the purpose of the Agreement is to preserve the existing zoning regime with respect to Potomac Cliffs to promote development, by its terms the Agreement does not bind the County's future use of its police powers. In § 3.1, the Agreement calls for property to be "developed in accordance with all applicable county laws, plans and regulations...." While it does maintain that, "in any event the property owners are entitled to develop up to... 252 units on the Potomac Cliffs Tract," the power of the Agreement to hold the County to the then-existing zoning laws was limited in two critical ways. According to § 5.2 of the Agreement, any change in state or federal laws or regulations enacted after the Agreement took effect did not require absolute deference to the preexisting zoning. Instead, the Agreement calls for the parties to confer in good faith in a reasonable attempt to modify the agreement to comply with the new laws and requires the County to cooperate to secure any permits that might become necessary. *Id.* Even more importantly, as will be shown below, the Agreement strictly limits the time for development to take place and so expressly does not freeze into perpetuity the zoning laws in place at the time the Agreement was made. These limitations on the length and extent to which the Agreement preserves zoning, and the fact that the Agreement merely preserves, but does not specifically change, the property's zoning, indicate that in making the Agreement, the County was exercising rather than abdicating its police powers to promote development.

### B. *Language of the Agreement*

■ Whether the Agreement was enforceable at the time of rezoning depends

---

**3.** 1995 Md. Laws, ch. 562, § 3 provided that "this subtitle may not abrogate existing powers, explicit or implied, exercised by a local government to enter development rights and responsibilities agreements before October 1, 1995."

on time limits provided by the Agreement for development and on which party was obligated by the Agreement to expand the sewage treatment plant. The unambiguous language of the Agreement demonstrates that Developers had an obligation to expand the sewage treatment plant as a predicate for development of the residential units and called for development of Potomac Cliffs within six years.

### 1. Standard of contract interpretation

 Well established principles of Maryland law guide this determination and limit what can be resolved at the summary judgment stage. Maryland follows the objective law of contract interpretation. As explained in *Taylor v. Nationsbank, N.A.,* 365 Md. 166, 178–79, 776 A.2d 645, 653 (2001), *quoting General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985):

> "A court construing an agreement under this test must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed... Consequently, the clear and unambiguous language of an agreement will not give away [sic] to what the parties thought that the agreement meant or intended it to mean."

The relevant standard is set forth in *Truck Insurance Exchange v. Marks Rentals, Inc.,* 288 Md. 428, 433, 418 A.2d 1187 (1980) (citations omitted), *quoting Ebert v. Millers Fire Ins. Co.,* 220 Md. 602, 610, 155 A.2d 484, 488 (1959):

> [A]n ambiguity does arise if, to a reasonably prudent layman, the language used is susceptible of more than one mean-

ing.... Of course, where contractual language is ambiguous, extrinsic evidence is admissible to show the intention of the parties. And if disputed factual issues are presented by the evidence bearing upon the ambiguity, construction of the contract is for the jury.... However, where there is "no real dispute as to the facts which are pertinent to the question of coverage," which are "shown by evidence properly admissible," construction is for the court.

On summary judgment, it is the job of the court to determine whether a contract is unambiguous. "In deciding whether a contract is ambiguous, the trial court must analyze the language of the contract, based on the plain meaning of the language used." *Shapiro v. Massengill,* 105 Md. App. 743, 754, 661 A.2d 202, *cert. denied,* 341 Md. 28, 668 A.2d 36 (1995), *citing Pacific Indemnity Co. v. Interstate Fire & Cas. Co.,* 302 Md. 383, 389, 488 A.2d 486 (1985). "If a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue." *World–Wide Rights Ltd. v. Combe Inc.,* 955 F.2d 242, 245 (4th Cir.1992) (citations omitted).

It is clear from the plain language and the context of the Agreement that the parties set out a plan for the development to occur within a fixed period of time and that the developers were responsible for upgrading the existing sewer and water facilities so that they would be sufficient for the new development.

### 2. Expansion of sewer treatment facility was predicate for development

Section 4.2.6 of the Agreement calls for sewer treatment plant design documents to be "submitted for approval no later than

six months after the effective date of this Agreement." Additionally, the Agreement states: "Construction of the additional capacity shall be pursued in a timely and reasonable manner, subject to timely approval by the appropriate authorities, so as to meet the schedule for development set forth in Section 3.2 of this Agreement." *Id.* The language of the Agreement clearly provides a time limitation for the submission of design documents from the party responsible for providing additional sewer capacity. Developers argue that the limitations on time for designing the additional sewer facilities do not apply to them because the Agreement did not give them the obligation to provide that additional capacity. Instead, they argue that in the event of a failure by the Newburg Tract owners, it was the responsibility of the County to provide the additional capacity. Paper no. 21, at 30–33. They assert that the County, therefore, could not rely on their failure to design and bond additional treatment facilities as grounds for denying final plat approval. Accordingly, Developers claim that their failure to develop the property within the period called for by the Agreement is the fault of the County and so the County should be estopped from claiming that Developers breached the Agreement by their failure to develop. *Id.*

Developers' claims are undermined by the language and context of the Agreement. Section 4.2 of the Agreement governs the construction of adequate sewer and water facilities for the development. Developers point for support for their contention that they are not responsible for the construction of facilities to conditional language in § 4.2.2(c) of the Agreement which reads:

In the event that the property owners of the Newburg Station Tract fail to initiate and construct the sanitary sewer and water systems herein described, the property owners of the Potomac Cliffs Tract **may** expand the Cliffton facilities sufficient to serve the Potomac Cliffs Tracts. Such expansion shall also accommodate capacity for 42 lots of the 299 lots of record representing the fraction $299/1802 \times 252$. Such expansion shall be at the Potomac Cliffs own expense and will be authorized for reimbursement pursuant to Sections 4.2.9 and 4.2.10. (Emphasis added).

Developers claim that the language that they "may expand" is conditional and so does not give them the responsibility for expanding the facilities. Paper no. 21, at 31–33. In the Agreement, § 5.10, Rules of Construction, defines "may" as permissive. Furthermore, the Agreement places primary responsibility on the owners of Newburg Station for construction of the facilities for both properties. *See* § 4.2.5(d) (holding Newburg Station owners responsible for construction of facilities by date set forth in § 4.2.6) and § 4.2.5(b) (mandating that owners of Newburg station submit facility construction costs to the County).

While Developers are correct in that § 4.2.2(c) does not seem to create an absolute duty for Developers to expand the sewer facility, they are incorrect in asserting that it creates no duty at all. The Agreement predicates development of the residential units on the provision of public facilities such as sewer treatment and schools to support it (see § 4.1.1. "Adequacy requirements"). Furthermore, § 4.2.1 states, "Under the present agreement, the property owners are responsible for the construction and financing of the sanitary sewer and water facilities for the property subject to this agreement and for the lots of record." This language imposes an affirmative responsibility on the both property owners for building and financing adequate facilities for the developments. Further support for that responsibility is

found in § 4.2.5(c), which outlines a plan for proportional reimbursement of both owners (not just the owners of Newburg Station, as Developers would have it). Therefore, the only reasonable reading of the agreement with passages in context is that if Newburg Tract fails to build facilities, Developers "may" step in, but must if they want to continue with the development because development is predicated on the adequate provision of facilities. In other words, the permissive quality to the "may" is that it gives Developers the option to expand existing facilities so as to continue with the development in the event that Newburg Tract does not live up to its end of the bargain. Accordingly, it was appropriate for the County to predicate final plat approval on the timely design and construction of additional water and sewer capacity. Developers cannot escape from being held to the time-frame contemplated by the Agreement.

### 3. Time-frame for development

Having settled that Developers were responsible for the timely design and financing of the sewer expansions, we look now to the time-frame set forth in the Agreement for development. As shown above, § 4.2.6 calls for the timely submission of designs for treatment facilities for the purpose of adhering to the schedule for development set forth in § 3.2. All of Developers' claims are predicated on a belief that the time-frame for development was open-ended and so the County had an obligation to preserve the zoning to allow for the development of 252 residential units as called for in the Agreement. Developers rely extensively on language in § 3.2 that states, "The construction schedule shall extend over a period of a minimum of ten (10) years, commencing, for purposes of this Agreement, August 12, 1988." However, that language applies to the development of both properties as a unit. Section 3.2(a) which, in contrast, pertains specifically to Potomac Cliffs, lays out a plan for development in 5 phases, the last finishing on August 12, 1994. This specific plan contradicts Developers' claims that the time for development was open-ended. Furthermore, as demonstrated above, if interpreted to freeze zoning into perpetuity (as it would by setting up an open-ended time-frame for development), the Agreement would be illegal contract zoning. Since courts follow "... a general rule of construction [that] presumes the legality and enforceability of contracts," any lingering ambiguity regarding the time-frame should be resolved in favor of enforceability. *Walsh v. Schlecht,* 429 U.S. 401, 407, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977).

The Agreement unambiguously gives Developers the obligation to expand the sewage facilities as a predicate to development in the event that the Newburg Tract owners failed to construct a new facility. Furthermore, the Agreement provided a six-year time frame in which development could take place. Therefore, there was no enforceable contract in place at the time the County rezoned.

### C. *Unconstitutional impairment of the right to contract*

■ The Contracts Clause states, in pertinent part, "No state shall... pass... any... Law impairing the Obligation of Contracts...." U.S. Const. Art. I, § 10, cl. 1. However, this is not an absolute prohibition. *See Allied Structural Steel v. Spannaus,* 438 U.S. 234, 240, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978); *see also United States Trust Co. v. New Jersey,* 431 U.S. 1, 21, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). Instead, the Supreme Court has developed a three-pronged test to harmonize the mandate of the Contracts Clause with another constitutional mandate re-

serving to the states those powers necessary "to provide for the welfare of their citizens." *Baltimore Teachers Union v. Mayor and City Council of Baltimore,* 6 F.3d 1012, 1015 (4th Cir.1993), *cert. denied,* 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994), *citing U.S. Trust,* 431 U.S. at 20, 97 S.Ct. 1505. This balance is described in *U.S. Trust,* 431 U.S. at 20, 97 S.Ct. 1505, *quoting Home Building & Loan Assn. v. Blaisdell,* 290 U.S. 398, 435, 54 S.Ct. 231, 78 L.Ed. 413 (1934):

> Thus a finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution. In the instant case... we must attempt to reconcile the strictures of the Contract Clause with the "essential attributes of sovereign power" ... necessarily reserved by the States to safeguard the welfare of their citizens. (Internal citations omitted).

The Fourth Circuit set forth the test for balancing these competing interests in *City of Charleston v. Public Service Commission of West Virginia,* 57 F.3d 385, 391 (4th Cir.1995), *quoting Baltimore Teachers Union,* 6 F.3d at 1015:

> Initially, a court must determine whether state law has, in fact, impaired any contract; if so, it must then determine if the contract was "substantially impaired;" if the state law is found to constitute a substantial impairment of the contract, a court must determine "whether that impairment is nonetheless permissible as a legitimate exercise of the state's sovereign power."

The first step of this test is dispositive in this case. As demonstrated above, there was no enforceable contract at the time County rezoned Potomac Cliffs and reclassified it for water and sewer usage. Therefore, because there was no enforceable contract to impair at the time the new zoning ordinances were enacted, the court does not have to go beyond the first step of the test for impairment. Developers fail to meet the test and so cannot win on their Contracts Clause claim as a matter of law.

### D. *Declaratory Judgment and Injunction*

Developers seek a declaratory judgment that the Agreement is currently a valid and binding contract enforceable against the County, and seek to enjoin the County, on the basis of the Agreement, from enforcing its ordinances that altered the pre–1997 zoning of Potomac Cliffs. As shown above, the Agreement was not an enforceable contract by 1997 and remains unenforceable currently. Therefore, the court will not grant Developers' request for declaratory and injunctive relief.

### E. *Breach of contract*

■ The County alleges that Developers' failure to expand and upgrade the sewage treatment plant is a material failure to perform that discharges any remaining duties on the County's part under the Agreement. Paper no. 20–1, at 35.

■ Failure of performance by one party suspends the duty of the other party to perform. See *Wilcom v. Wilcom,* 66 Md.App. 84, 94, 502 A.2d 1076 (1986), *citing* Restatement (Second) of Contracts, § 237. The Restatement, comment to § 237, at 215–16 states that a material failure of performance by one party "prevents performance [of the other party's remaining duties] from becoming due, at least temporarily, and it discharges those duties if it has not been cured during the time in which performance can occur." As with a breach of a contract, the failure must be material. "A breach is material if it affects the purpose of the contract in an

important or vital way." *Shapiro*, 105 Md. App. at 757, 661 A.2d 202.

Since the development plan was predicated on the Developers' ensuring the provision of adequate sewer and water facilities (see above), Developers' failure even to gain design approval for a plant within the time allocated by the Agreement for development of the residential units affects the purpose of the contract in a vital way. Therefore, Developers' failure to design and bond the facilities' expansion is a material failure to perform. Given that Developers had not designed or bonded the expansion of the facilities within the time allocated by the Agreement for development, performance by Developers is no longer possible. Therefore, any obligation on the County provided by the Agreement was discharged when the time for performance contemplated by the Agreement passed. Accordingly, the Developers cannot win their breach of contract claim.

## IV. Conclusion

At the time the County rezoned Potomac Cliffs and reclassified it for water and sewer use, thereby reducing the allowable density of residential units on the property, there existed no enforceable contract obligating it to Developers. Accordingly, the County's motion for summary judgment will be granted as to all counts and Developers' cross-motion denied as to all counts. A separate order will be entered.

### *ORDER*

For the reasons stated in the foregoing Memorandum Opinion, it is this _____ day of October, 2001, by the United States District Court for the District of Maryland, ORDERED that:

1. Defendants' motion for summary judgment BE, and the same hereby IS, GRANTED as to all counts;

2. Plaintiffs' cross-motion for summary judgment on Counts I, II, and III BE, and the same hereby IS, DENIED;

3. It is hereby DECLARED that the 1989 Development Agreement is not a valid and binding contract enforceable by Plaintiffs against Charles County, Maryland;

4. JUDGMENT BE, and the same hereby, is ENTERED in favor of Charles County, Maryland, Board of County Commissioners of Charles County, Maryland, Charles County Planning Commission (Plaintiffs) and Charles County Department of Planning and Growth Management and against Trustees John B. Bolech, Kenneth A. Haapala, Daniel C. Meisinger, and Dennis Winson (Defendants) on all claims; and

5. The Clerk will transmit copies of the Memorandum Opinion and this Order to counsel for the parties and CLOSE this case.